**1814.**

**ENSLIN** *against* **BOWMAN** et al. Executors of
STEWART.

IN ERROR.

The commissioners under the compensating act of 4th *April* 1799, and its supplements of 15th *March* 1800, and 6th *April* 1802, had no jurisdiction of the application of a *Connecticut* claimant for land within the seventeen townships, nor any authority to issue a certificate in his favour, unless he or those under whom he claimed, had been actually settled and resident on the land before the decree at *Trenton.*

The certificate of the commissioners in favour of a *Connecticut* claimant, stating that he or those under whom he claims, were actually so settled and resident, does not conclude a *Pennsylvania* claimant.

A *Pennsylvania* settler, whose title to land within the seventeen townships, arose subsequent to the 28th *March* 1787, is entitled to hold against any *Connecticut* claimant, except one actually settled and resident there before the decree at *Trenton,* or one claiming under such a settler.

THIS was an action of ejectment in the Common Pleas of *Luzerne* county, by the executors of *Stewart* against *Enslin,* in which the jury found the following special verdict.

"The jury find and return the following special verdict: That on the 16th *January* 1800, *Samuel Jameson,* of the township of *Newport,* applied under the act of the 4th *April* 1799, entitled "an act for offering compensation to the *Penn-* "*sylvania* claimants of certain lands within the seventeen "townships in the county of *Luzerne,* and for other purposes "therein mentioned," for 700 acres of land, to wit, 400 acres thereof in the township of *Hanover,* and 300 acres the residue in the township of *Newport,* in the county of *Luzerne;* and that on the 5th day of *December* 1800, *Jeremiah Hagerman* of *Poughkeepsie* in the state of *New York,* heir at law of *John Hagerman* deceased, applied under said act for 750 acres of land in the township of *Newport* aforesaid. That on the 10th day of *September* 1802, lots No. 46 & 48, were resurveyed by order of the commissioners appointed to put in execution the aforesaid act of assembly, by *Thomas Sambourne* surveyor to said commissioners, and a draught thereof made and returned to said commissioners, bearing date *December* 1st 1802. That on the 16th *January* 1804, the following certificate was granted by *Thomas Cooper* and *John M. Taylor* two of the commissioners under said act, to *James Stewart* the above named testator, to wit, "We "the undersigned commissioners, duly appointed for putting "in execution an act of the general assembly of the Com- "monwealth of *Pennsylvania,* entitled "An act for offering "compensation to the *Pennsylvania* claimants of certain lands "within the seventeen townships in the county of *Luzerne,* "and for other purposes therein mentioned," passed the 4th "day of *April* 1799, and the supplement to the act passed "the 15th day of *March* 1800, and the further supplement "thereto passed the 6th day of *April* 1802, do certify, that "*James Stewart* is the owner as a *Connecticut* claimant

" of one hundred and sixty acres of land in the township of
" *Newport*, one of the beforementioned seventeen townships,
" being Nos. 46 and 48, in the second division of the said
" township, *which numbers 46 and 48, were severally occu-
" pied by a Connecticut claimant and actual settler there, be-
" fore the time of the decree of Trenton*, and were particularly
" assigned to such actual settler, prior to the said decree,
" agreeably to the regulations then in force among the set-
" tlers. The said land (a draught of survey whereof is here-
" unto annexed) is included in the application of *Samuel
" Jameson* and *Jeremiah Hagerman*, under the provision of
" the act aforesaid, of which applications an official transcript
" has been transmitted to us, from the land office of this
" Commonwealth of *Pennsylvania*, No. 52, 663, of the said
" tracts; fifty acres part thereof is of the third class, the resi-
" due thereof of the fourth class. *January* 16th 1804. Sign-
" ed *Thomas Cooper*, and *John M. Taylor*."

—" We further find that the aforesaid survey was returned
into the office the 11th *July* 1808, and that in pursuance of
said survey and certificate, and the last will and testament of
the said *James Stewart* deceased, a patent issued from the
Commonwealth of *Pennsylvania* for the said lots, Nos. 46
and 48 of the second division of *Newport* township, on the
13th *July* 1808, to *Ebenezer Bowman* and *Joseph Jameson*
executors of the said *James Stewart*, deceased, in trust for
the uses mentioned in the said last will of the said *James
Stewart*. And we further find that the said *John Hagerman*
made application for the said lot No. 48, to the commis-
sioners appointed under the law of 1787, commonly called
the confirming law; and that in the said year 1787, the town
lot of the town of *Newport* was surveyed to the said *John
Hagerman* by *William Montgomery*, and out lines of the
said town, and cross lines of the said township, were run in
the summer of the same year, and no person was settled
then on the said lot, run for the said *John Hagerman*, and
but few in the township."

" And we do further find, that a warrant issued from the
Commonwealth of *Pennsylvania* to *Sarah Hollenback*, on
the 10th day of *May* 1792, for four hundred acres of land,
to include a small bog meadow on one of the head branches
of *Forge Creek*, that empties into the east side of the *Sus-*

quehanna near the Nanticoke falls on the said river. That in pursuance of said warrant, on the 9th day of December 1793, four hundred forty one acres and one quarter and allowance &c., were surveyed on the head of the Forge branch of Nanticoke, and returned on said warrant into the land office of Pennsylvania. That the purchase money was paid on the 5th June 1792. That in 1792, the warrantee aforesaid begun an improvement, raised ore, and exercised other acts of ownership on said premises, and in the year 1794, built a dwelling house on the land, and in the spring of 1795, placed a tenant in the house so built the preceding season, who continued to reside therein and thereon, clearing and cultivating and improving said land, until the spring of 1798, when George Enslin, the above named defendant, came into the possession of the said house and land by virtue of a deed poll from the said Sarah Hollenback the aforesaid warrantee, to him the said George Enslin, dated February 24th, 1798."

" And we do further find, that a patent issued in pursuance of the said warrant, survey and deed poll, to the said George Enslin, on the 11th day of June 1798, and that the said George Enslin has continued to reside on the premises in dispute, from the spring of 1798, to the time of finding this verdict. That he the said George had planted an orchard, built a new house and barn, and cleared thirty or forty acres before the present ejectment was brought."

" And we do further find, that the first actual settlement made on the lots and land for which the ejectment was brought, was made under the warrant aforesaid to the said Sarah Hollenback, and that no person or persons ever improved settled or lived on either of the said lots No. 46 and 48, except the above named defendant, and those under whom he makes title."

" And we further find, that John Hagerman, Jeremiah Hagerman, Samuel Jameson and James Stewart aforesaid, or either of them, never improved, nor lived, or settled on either of the said lots No. 46 and 48, nor lived in Newport township aforesaid; and we further find that the land in dispute for which this ejectment is brought is comprised in the plaintiffs' survey certificate and patent aforesaid, and also in the aforesaid warrant, survey and patent to the defendant as aforesaid. And we further find that the commissioners un-

der the confirming law of 1787, opened their office some
time in the summer of the same year, and were driven off
and left the county about the 1st *October* in said year."

" Upon the above finding, if the Court shall be of opinion
the plaintiffs by law are entitled to recover, then we find
for the plaintiffs, six cents damages and six cents costs; but
if the Court shall be of opinion that upon the whole finding,
the plaintiffs by law ought not to recover, then we find in
favour of the defendant."

Upon this verdict judgment was rendered for the plain-
tiffs below, and the defendant took a writ of error.

The case was elaborately argued in this Court, by *Dun-
can* for the plaintiff in error, and by *Watts* for the defend-
ants in error.

TILGHMAN C. J. It appears by the special verdict in this
case, that *George Enslin*, the defendant below, claimed under
a warrant to *Sarah Hollenback*, dated 10th *May* 1792, for 400
acres of land, a survey in pursuance of the said warrant on
the 9th *December* 1793, regularly returned to the land office,
and a patent on the 11th *June* 1798, the purchase money hav-
ing been paid on the 5th *June* 1792. It appears also that the
*first* and the *only* actual settlement made on the land in dis-
pute, was by the defendant, or those under whom he claims.
He had been long in possession previous to the bringing of
this ejectment, had cleared thirty or forty acres, planted an
orchard, and built a dwelling-house and barn. The plain-
tiffs derived their title from a patent dated 30th *July* 1808,
founded on a certificate from *Thomas Cooper* and *John M.
Taylor*, commissioners for carrying into execution the pro-
visions of the " act for offering compensation to the *Penn-
" sylvania* claimants of certain lands within the seventeen
" townships in the county of *Luzerne*, and for other pur-
" poses therein mentioned," passed the 4th *April* 1799, and
the supplementary acts passed the 15th *March* 1800, and
the 6th *April* 1802. This certificate bears date the 16th
*January* 1804, and sets forth that the land *was occupied by a
Connecticut claimant, and actual settler there, before the time
of the decree of Trenton.* This assertion seems at first to be in
direct opposition to the finding of the jury; but is rendered
consistent with it by the explanation afforded by the plain-

tiff's counsel. They suppose that by the certificate of the commissioners it is only meant, that the land was occupied by one who was an actual settler, according to the rules and regulations of the *Susquehanna Company.* Now, according to those rules, a man may be an actual settler without having ever been in the state of *Pennsylvania.* The *Susquehanna Company* sold by townships, some of which contained 23,000 acres. The purchaser was to place twenty able bodied men on the township, which being done, the condition of settlement was complied with, and the title of the purchaser became perfect.

In order to determine whether the commissioners were right in their construction of the laws under which they acted, it will be necessary to consider not only the laws themselves, but certain well known historical facts which led to the making of them.

Soon after the purchase made by the late proprietaries of *Pennsylvania* of the *Indians,* in the month of *November* 1768, a number of men from *Connecticut* took possession of a tract of country about *Wyoming,* on the north branch of *Susquehanna,* claiming under a deed from the *Indians* to certain persons associated under the name of the *Susquehanna Company.* These persons claimed adversely to the proprietaries of *Pennsylvania,* and asserted that the country included in their deed was within the bounds of the charter of *Connecticut.* This unfortunate controversy was attended with riot, disorder and bloodshed, which continued until the commencement of the revolutionary war, when the Congress of the *United States,* alarmed at the consequences which might result from a dispute of so serious a nature between two powerful states, recommended that all acts of force should be abstained from, and each person should remain in possession of the land occupied by him, until a proper season should arise for determining the matter on principles of justice. This recommendation was complied with. The *Connecticut* settlers were the most numerous, and held possession during the war, in the course of which they suffered great hardships and lost many lives, being on a remote frontier much exposed to the attacks of the *British* and the *Indians.* In the month of *December* 1782, the cause between *Pennsylvania* and *Connecticut,* having been heard by a court of

commissioners appointed under the articles of confederation, was finally decided in favour of *Pennsylvania.* From this period the courts of *Pennsylvania* must consider the title of *Connecticut* of no validity, either in law or equity, except as it may have since been confirmed by our own acts of assembly.

Soon after the decree of *Trenton,* the *Connecticut* settlers seem to have been proceeded against with undue severity. This produced an act of assembly for restoring the possession from which they had been forcibly removed. The council of censors too made a remonstrance in their favour in the year 1784. At length, on the 28th *March* 1787, an act of assembly, called the *confirming act,* was passed, of which it will be necessary to take particular notice, as it is alluded to in the special verdict. The preamble of this act recites the decree of *Trenton,* and the *settlement* of a number of the inhabitants of *Connecticut* on the disputed territory *prior to the said decree.* It recites also that the interfering claims of the *Pennsylvania* and *Connecticut* men had occasioned much contention, expense and bloodshed; and that the assembly were desirous of putting an end to these evils, by confirming such of the *Connecticut* claims as were acquired by *actual settlers prior to the decree of Trenton.* It is then enacted that " all the said rights or lots now ly-
" ing within the county of *Luzerne,* which were occupied
" or acquired by *Connecticut* claimants, *who were actually*
" *settlers there,* at or before the termination of the claims of
" the state of *Connecticut,* by the decree aforesaid, and
" which rights or lots were particularly assigned to the said
" settlers prior to the said decree, agreeably to the regula-
" tions then in force among them, be and they are hereby
" confirmed to them and their heirs and assigns." It is very clear, that the only persons intended to be relieved by this law, were persons *actually settled* in the county of *Luzerne* prior to the decree of *Trenton;* and that the words " *agreea-*
" *bly to the regulations then in force among them,*" refer not to the *actual* settlement, but to the *assignment of particular rights or lots to particular settlers.* By *actual settlers* we understand persons *residing* on the land. It is a class of people always favoured by the late proprietaries, and by the state of *Pennsylvania;* and it having been thought of impor-

tance to define the term *settlement* precisely, it was enacted by the act of 30th *December* 1786, (passed by the very same persons who made the *confirming* law) that by *a settlement* should be understood " an actual, personal, resident settle- " ment, with a manifest intention of making it a place of abode, " and the means of supporting a family, and continued from " time to time, unless interrupted by the enemy, or by go- " ing into the military service of this country during the " war." That persons of this description should be confirm- ed in their claims, there was some reason, because they had entered into possession while the right was undecided; they had all suffered, and many bled in defence of the country. But it will be difficult to assign any motive, either of jus- tice or policy, which should have induced the legislature to take away the rights of their own citizens, in order to make way for persons who had rendered the state no service, but on the contrary had been the authors of much disturbance, expense and vexation. The confirming law at the same time made compensation to the *Pennsylvania* claimants, who had acquired titles before its passage, by a grant of lands in other parts of the state.

This law which was made with such beneficent intentions, did not prove satisfactory to either party. Its execution was opposed even in the county of *Luzerne.* The commissioners were interrupted before they had made much progress in their work. In consequence of this, their powers were sus- pended by the act of 29th *March* 1788, in which it is said, " that the commissioners had been interrupted in their pro- " ceedings by the combinations, threatenings, and outrageous " violence of certain lawless people in the said county of " *Luzerne*, and obliged to fly for the preservation of their " lives." At length the confirming law was repealed in terms of strong reprobation by the act of 1st *April* 1790, by which it was declared, that the repealed act was " unconsti- " tutional and of the most dangerous consequence." The opinion thus expressed of its unconstitutionality, was con- firmed by the Circuit Court of the *United States*, in the case of *Vanhorne's Lessee* v. *Dorrance.* That cause was removed to the Supreme Court of the *United States* by writ of error, where it was terminated by a *non pros* suffered by the plain- tiff in error. It is unnecessary to enter now into the consti-

tutional question, because the commissioners under the confirming law were interrupted before they had completed any business, and the law itself was annulled by the same authority from which it derived its existence.

From the 29th of *March* 1788 the *Connecticut* claimants were neglected by the legislature until the 4th of *April* 1799, when the act was passed under which the certificate of the commissioners was issued, on which the plaintiffs found their title. It was the object of the act to induce the *Pennsylvania* claimants to release their rights for a moderate compensation in money, in order to quiet the country by confirming the title of such *Connecticut* claimants in the seventeen townships of *Luzerne* county, " as were actually " settlers there at or before the time of the decree of *Tren*- " *ton*, and whose rights or lots had been particularly assigned " to them prior to the said decree, agreeably to the regula- " tions then in force among them," just in the words of the *confirming law*. In order then to give the commissioners jurisdiction, it was necessary, that the person in whose favour the certificate was to be issued, or those under whom he claimed, should have been actually settled within the seventeen townships prior to the decree of *Trenton*. Whether there should not also have been a settlement on each tract included in the certificate, I give no opinion at present, because the special verdict finds no settlement of any kind within the seventeen townships.

But it is contended that the certificate of the commissioners is conclusive evidence of the truth of the facts asserted in it. Respecting the title under *Connecticut*, it may perhaps be conclusive between *Connecticut* claimants, because the commissioners are authorized to decide between them, although if either party chuses, he may withdraw the cause previous to their decision, and carry it to the court of Common Pleas. But if the commissioners are permitted to make the decision, the certificate of their clerk is declared by the law to be sufficient evidence to obtain a patent from the land office. Touching the rights of *Pennsylvania* claimants the commissioners had no power to decide. If they differ among themselves the board of property decides in the first instance, with liberty to the party against whom the decision is made, to bring an ejectment for the purpose

of having the cause re-heard in the courts of common law: The *Pennsylvania* claimant never appears before the commissioners. It would be unjust therefore, that he should be concluded by their certificate, nor is there any thing in the law which favours such injustice. It is no where said that he shall be concluded.

It is to be remarked, that the act of 4th *April* 1799 left it optional with the *Pennsylvania* claimant to release or not, and unless he released, the commissioners had no power to grant a certificate in favour of a *Connecticut* claimant. But the act of 6th *April* 1802 went farther, and authorized the commissioners to certify not merely such parts of the tracts of land claimed under the title of the *Susquehanna* company as should be released by the *Pennsylvania* claimant, but " the whole of each tract claimed by a *Connecticut* claimant, " who should establish his title thereto in the manner pre- " scribed by the act of 4th *April* 1799," whether released to the Commonwealth by the *Pennsylvania* claimant or not. The act then goes on to provide, that such *Pennsylvania* claimant as should not release to the Commonwealth *under the provisions of the said act of* 4th *April* 1799, on or before the 1st of *August* 1802, should be disabled from recovering the land in any action against the *Connecticut* claimant in whose favour a certificate had been issued, but might institute an action against the Commonwealth in which he should be entitled to recover a just compensation for his land.

Hitherto we see that no *Connecticut* claimant was entitled to a certificate, unless he derived title through a person who was a settler prior to the decree of *Trenton;* nor could any *Pennsylvania* claimant release to the Commonwealth and demand compensation, unless his title accrued prior to the said decree. But by the act of 9th *April* 1807, all *Pennsylvania* claimants were let in who had acquired title prior to the 25th of *March* 1787, (the date of the confirming law) and by the same law it is enacted, " that the com- " missioners in examining the claims of the *Connecticut* " claimants, *shall not require the same lands to have been* " *occupied prior to the decree of Trenton.*" This last provision may produce consequences more important than perhaps were foreseen at the time it was made, although it cannot affect the present certificate which was issued long

before its date. But what is there in any of these laws to affect the title of the defendant, which accrued subsequent to the 28th of *March* 1787, and who consequently is not entitled to an action against the Commonwealth for the recovery of compensation? It is contended that his right is extinguished by the act of 6th *April* 1802. But this appears to me to be a position not to be supported, because the words of that act only embrace the case of *Pennsylvania* claimants, who shall refuse or neglect to release to the Commonwealth *under the provisions of the act of* 4th *April* 1799. Now it is clear that no *Pennsylvanian* can release under the provisions of that act, whose title accrued subsequent to the 28th of *March* 1787; therefore no such titles are within the meaning of the act of 6th *April* 1802. Nothing less than the most pointed, unequivocal expressions would ever convince me, that it was the intent of the legislature to take any man's property without a reasonable compensation; because not only would it be an act of injustice, but a violation of the constitution, which has prescribed limits to the legislative power. The legislature are the judges of those great occasions when it may be expedient to break in upon the rights of private property making just compensation. But to take property without compensation is beyond their power. Such I take to be the decided opinion throughout the *United States;* and I am confident that the legislature of *Pennsylvania* will never act in contradiction to it. Upon the whole of this case then it appears, 1st, that the defendant has a perfect title by warrant, survey and patent, from the state of *Pennsylvania;* and, 2d, that the title remains unimpaired by any act of assembly. I am therefore of opinion that the judgment should be reversed, and judgment entered on the special verdict for the plaintiff in error.

If as the plaintiff's counsel seem to apprehend, this decision should produce results distressing to the inhabitants of the seventeen townships, I shall be sorry for it. I have always wished for their peace, and have done what I could to promote it, by releasing all my interest in lands in those townships. But to a judge it is only permitted to interpret the law honestly and impartially. If when interpreted, it is attended with inconvenience, it is for the higher powers to provide a remedy.

YEATES J. The tenth section of the ninth article of the constitution of this Commonwealth declares, that " no man's " property shall be taken or applied to public use, without " the consent of his representatives, and without *just com-* " *pensation* being made." In the exposition of laws we cannot suppose that the legislature have been unmindful of this wise provision. Cases may undoubtedly occur, wherein however sacred the rights of property may be deemed, it would be necessary for the common welfare, that they should bend to the public interests in matters of great national concern.

The decree at *Trenton* on the 30th of *December* 1782, grounded on the provisions of the old confederation, terminated the dispute between *Pennsylvania* and *Connecticut* as to the territory claimed by the latter; but the commissioners recommended the case of actual settlers, under the title of the *Susquehanna Company*, to the consideration of the *Pennsylvania* legislature; and the justice and equity of the claims of those settlers, was also strongly reported by the council of censors in 1784. Hence arose the confirming act of 28th *March* 1787, upon which the defendants in error confidently rely, as plighting the faith of this government to the *Connecticut* claimants. To this it is answered, that this act has been solemnly determined in *April* 1795, in *Vanhorne's Lessee* v. *Dorrance*, 2 *Dall.* 304, 320, to be unconstitutional and void, that it was invalid from the beginning, had no life or operation, and was precisely in the same state, as if it had not been made. It was suspended by the act of 29th *March* 1788, and finally repealed by the law passed on the 1st of *April* 1790.

If the law of *March* 1787 was in full force, I should adopt the construction of it, as contended for by the plaintiffs' counsel, that the *actual settlers* whose claims were intended to be confirmed thereby, were such persons only, as had acquired a title by *actual settlement*, prior to the determination of the dispute between the two states, as defined by our law of the 30th *December* 1786, and enacted by the same legislature. I take this to be the true meaning of the expressions made use of, most conformable to the reason and policy of the act, and the spirit which dictated it. The object of the lawgivers was not to recognize the

1814.

ENSLIN
v.
BOWMAN
et al.

validity of the titles held under the *Susquehanna Company*, but to quiet the possessions of those who were the real occupants of lands under that claim.

The certificate signed by the commissioners on the 16th of *January* 1804, brings the case of *James Stewart* the defendant's testator, within the words of the different laws of 4th *April* 1799, 15th *March* 1800, and of 6th *April* 1802. But it is found by the special verdict, that neither he nor any one under whom he claimed, ever improved, lived or settled upon any part of the lands in question, and that the first actual settlement made thereon, was under the warrant granted to *Sarah Hollenback*, by the Commonwealth of *Pennsylvania* on the 10th of *May* 1792.

This introduces the question, whether the certificate of the commissioners is conclusive evidence of the facts stated therein, against one claiming the same lands under a *Pennsylvania* title?

It is admitted, that no express provision is to be found in any law ascribing to these certificates such conclusive character; but it has been urged on the part of the defendants, that it necessarily arises from the act of 6th *April* 1802. To this I answer that the duties of the commissioners are specially pointed out by the act of 4th *April* 1799. They decide merely between the *Connecticut* claimants, who by the eleventh section are allowed an appeal before they should make their decision. Such appeal is not given to persons claiming under *Pennsylvania* titles; they are not even heard before the commissioners. How then can they be bound finally by acts, to which they are neither parties nor privies, which it was not in their power to contest? This would be rank injustice. I fully agree, that these certificates given by judicial officers, on whom arduous duties have been imposed, are *prima facie* evidence, and may be admitted in suits against *Pennsylvania* claimants. They should be treated with due respect, but are open to proof by persons entitled to lands under *Pennsylvania* rights, although conclusive between claimants under the *Connecticut* title, if unappealed from. The same distinction has uniformly prevailed, when the certificates of the *Virginia* commissioners have been admitted to the jury in contests between persons claiming lands under either state.

1814.

Enslin
v.
Bowman
et al.

The plaintiff in error here claims under a regular warrant from *Pennsylvania*, dated 10th *May* 1792, upon which the purchase money has been paid, a survey made on the 9th of *December* 1793, and a patent granted to him on the 24th of *February* 1798. He and those under whom he claims, have made the first actual settlement on the lands in question, first erected a cabin, planted an orchard, then built a new house and barn, cleared between thirty and forty acres of land, and have been in the constant possession of the premises. Having acquired a title *subsequent to* 28th *March* 1787, he can obtain no compensation under the provisions of the act of 9th *April* 1807, if he is doomed to be a sacrifice to the public tranquillity. Why then is he to be dispossessed of his right? What law has he offended? It is not correct to assert, that this Commonwealth by any legislative act, acknowledged the right of *Connecticut* or of the *Susquehanna Company*, to grant lands within the charter boundary of *Pennsylvania*. I can discover no law wherein the validity of such titles has been recognized.

The intention of the legislature in enacting the law of 28th *March* 1787, is fully disclosed in its preamble. It recites that, " whereas before the determination of the claim of " *Connecticut*, a number of its inhabitants with their asso- " ciates, settled upon and improved divers tracts of land " lying on and near the north east branch of the river *Sus-* " *quehanna*, and the waters thereof, and now within the " county of *Luzerne;* and whereas parts of the same lands " have been claimed under titles derived from the late pro- " prietaries of *Pennsylvania*, and those interfering claims " have occasioned much contention, expense, and blood- " shed, and this assembly being desirous of putting an end " to those evils by *confirming such of the Connecticut claims* " *as were acquired by actual settlers* prior to the determi- " nation of the said dispute, agreeably to a petition of a " number of the said settlers, and by granting a just com- " pensation to the *Pennsylvania* claimants, &c." It then proceeds to make provision for these professed objects of restoring peace and good order, and of preventing the effusion of human blood. The proceedings of the commissioners having been interrupted at *Wilkesbarre* in *December* 1787, its operation was suspended in *March* 1788, and finally

repealed in terms of strong condemnation by an act passed on the 1st of *April* 1790, " whereby all proceedings under " the act of 28th *March* 1787 were declared void, and all " titles and claims under it were revested in the former " owners."

Whithin a period somewhat exceeding two years from the time of the repeal of the first act of 1787, when the tide of public opinion manifested by a strong act of the legislature, had evidently begun to run in a different direction, the warrant was taken out by *Sarah Hollenback*, and an actual settlement took place on these lands. No man however prudent, could foresee what was afterwards done by the laws of 4th *April* 1799, 15th *March* 1800, 6th *April* 1802, 4th *April* 1805, and 9th *April* 1807. The lands in the seventeen townships in *Luzerne* county had not been exclusively set out and reserved for the *Connecticut* claimants, and the law which had confirmed the occupation of certain of them under particular modifications, had been repealed. I see no ground to brand any person with the character of a speculator, or of having acted in a manner unbecoming a good citizen, who has taken out a warrant for vacant lands then not actually settled by *Connecticut* claimants; nor can I discover any impropriety in such person appealing to the laws of his country for the protection of his possession, until he has received a full equivalent for his title thus acquired.

Upon the whole matter I am of opinion, that the judgment of the Court of Common Pleas of *Luzerne* county be reversed, and that judgment for the plaintiff in error be rendered on this special verdict.

BRACKENRIDGE J. It is not found by the special verdict, that the lot in question, "*was occupied by a Connecticut* " *claimant and actual settler there before the time of the decree* " *of Trenton, and was particularly assigned to such actual* " *settler prior to the said decree agreeable to the regulations* " *then in force among the settlers.*" But it is certified by the commissioners duly appointed &c., under an act entitled &c., that it was so occupied &c. as in the certificate of the said commissioners specified. But can this certificate be traversed, or the truth of it called in question? Not, I should take

it as at present advised, *by the Commonwealth*, who has ap-
pointed these commissioners, and may be considered as
bound by their proceedings. But can it be said that an indi-
vidual, not a party to their proceedings, and who has an
adverse claim or right, shall be bound? Shall not the truth
of the case be shown? It may be considered in the nature of
an inquisition of office on the part of the state and the *Con-
necticut* claimant, but shall not affect third persons who
claim a paramount or adverse interest.

It is found by the special verdict, that the lot in question
was surveyed in the summer of 1787, and " *that no person*
" *was settled then on the lot.*" *Non constat*, but that some
one under whom the plaintiff claims had occupied and was
settled on it before the decree of *Trenton*, and therefore the
special verdict does not falsify the certificate, which cannot
but be admitted to be *prima facie* evidence. Upon this point
alone I find a difficulty in saying that the judgment should be
set aside; for a temporary non occupance may have been ow-
ing to the falling in the war, or other causes, and that pre-
sumption of abandonment might be rebutted by showing the
truth. As to the ground upon which the plaintiff has put the
case, it is totally untenable; at least the ground upon which
his counsel has argued it is not to be sustained. He seems
to consider the commissioners as having had a power to
proceed in the case of a lot or piece of ground, *not occupied
by a Connecticut claimant, or settled before the decree.*
Whereas it could not but have been the first object of their
enquiry, in order to ascertain whether *they had jurisdiction.*
A *constructive* occupancy or settlement was unknown to the
laws or usages of *Pennsylvania*, and why should it be
known in this case? Nor could an actual occupancy and set-
tlement be considered as attaching to more than to the usual
extent of 300 acres with the allowance &c.

What was the foundation of the interposition of the legis-
lature? Not a grant from *Connecticut* under a pretended or
alleged extent of charter. Not any title derived from a
*Susquehanna company* under an alleged purchase from the
*Indians.* It was a moral obligation, and I have always
considered it a moral obligation, to relieve the mistaken
and misled inhabitants, who had settled on these lands
under an idea of right, and where the situation of things,
and the nature of the case, furnished a ground of mistake,

so that they were not to be considered absolutely in the light of *voluntary trespassers*, more especially as *Indian* hostilities, incited by the general enemy with whom we were at war, were combatted by those very settlers at their out posts, where many of them fell, and at whose peril and by whose sufferings the interior of the state had been so much defended. These were the considerations of the recommendation of the council of censors, the act of 1787, and all the succeeding acts that have taken place on the subject; to relieve the actual settlers and put them on the same footing with our actual settlers, in other parts of the state, who were protected from office rights, and by a usage known to our laws, both as to the nature of the settlement and the extent of it. Such a thing as twenty settlers claiming six miles square, and allotting all within it to themselves or to others who might come after them, and to whom they might dispose of this territory, was never heard of, and it could not be within the meaning of the legislature. " Rules and regulations amongst " the settlers or *Susquehanna company*," where that word is used, could mean nothing more than the allotment of their portions, shares or half shares, the *locus in quo* of their settlements, the extent and boundaries, subject still to our ideas of quantity to any settler, if the allotment should exceed. Constructive settling, or allotment to those who had never settled, was absurd, and would be countenancing a speculation that was inimical to actual settlements, and the occupancy of the country. At least occupancy and settlement under this idea, and in this way, was never meditated, or in the view of appointing commissioners with any powers whatever. Were it not that it is found by the special verdict, that no settlement had been made prior to the occupancy of the defendant, a *venire de novo* might be awarded with a view to give the plaintiff an opportunity to shew if he can, that an occupancy of the lot in question did exist before the decree of *Trenton*, and that he has succeeded to that possession, as evidence of which I will admit the certificate, but not as the foundation of the claim. A settlement must be established. Having proved an original occupancy before the decree of *Trenton*, the certificate may be evidence of the right derived to him, as the mesne conveyances may be considered as having been delivered up to the commissioners; and this

1814.

ENSLIN
*v.*
BOWMAN
et al.

is what is meant I presume by the title deeds &c. delivered up. For what other papers would there be than these, the vouchers of transmission and the possession handed over, since there is no other kind of deeds that could have been contemplated, no kind of grant being acknowledged under the charter of *Connecticut*, or *Indian* title to these lands, or the lot which is the object of the ejectment in this case.

. But it being found by the special verdict that no settlement had been at any time before the possession of 'the defendant, excludes the above considerations as to the awarding a *venire* on the reversal of this judgment, and to which reversal I accede in this case.

Judgment reversed.

---

*Sunbury,*
*Saturday,*
June 18.

A trustee, who is lessor of the plaintiff in ejectment, is a good witness for the defendant to shew that the real trust is different from that declared in the conveyance.

Declarations made by the grantor to the grantee, after the execution of a deed of trust, but before the grantee had accepted it, are evidence to alter or contradict the trust.

Copy of a cancelled bond in the defendant's possession, is after notice and refusal to produce the original, good evidence of the matters contained in the condition, without first shewing how the bond came to be cancelled.