The opinion of the Court was delivered by
Gibson J.
The only question is, whether a certificate of the commissioners, under the act for granting compensation to the Pennsylvania claimants, for lands within the Seventeen Townships, is conclusive between Connecticut claimants; or whether, to raise a trust, it is open to a party to shew, that the commissioners were imposed on, and that the certificate ought to have been issued to him. In Perkins v. Gay, *99 3 Serg. & Rawle, 327, this question was decided, on great consideration, by two Judges of this Court; and, unless that decision is plainly wrong, we ought not to depart from it.. What were the powers of the commissioners ? The board was constituted a tribunal, to decide on, and .quiet, all questions of original right between Connecticut claimants, before Pennsylvania should proceed to invest them with title. By the fifth section of the principal act, the commissioners were to ascertain all the rights or lots, within the townships named, which were occupied or acquired by Connecticut claimants, before the decree of Trenton; “and make out certificates therefor, with a draft of the survey thereto annexed.” In the execution of this power, it was impossible, but that disputes, which it would be absolutely necessary to have decided by some tribunal, should arise. It is true, the Susquehanna Company, in apportioning its lands among settlers, pursued a wise course, by having, before any part was granted, the whole country on the branches of the Susquehanna, north of the forty first degree, surveyed and laid off in lots; and hence, as there were, in no instance, separate grants of the same lot, (except perhaps, where the right was forfeited for a violation of the rules of the company,) • there could be no dispute on the subject of original title. A copy of this survey, together with an ample collection of scarce documents, made by Judge Cooper, when one of the commissioners, I lately deposited with the secretary of the historical branch of the American Philosophical Society. But though there were few, if any conflicting grants, the transmission of the rights of the original half share- holders,- by deed, or otherwise, would necessarily give rise to.many controversies. Many questions of boundary, also, would have to be decided. It was accordingly provided, by the eleventh section of this act, 1‘ that in case of disputes between the Connecticut claimants, they may elect to have the same decided by the said commissioners, or appeal, before such decision, to the Court of Common Pleas of the proper county; and a certificate of the clerk of such commissioners, or from the prothonotary of such Court of Common Pleas, before which tribunal such decision , may be had, certifying in whose favour the same is adjudged, shall be good evidence to obtain a patent from the proper office aforesaidAnd by the fourth and fifth sections of the supplementary act of the *100 6th April, 1802, Connecticut claimants, who should be infants, or residents out of the State, or prevented by sickness or other infirmity’, from attending personally before the commissioners, were to exhibit their title by attorney : the commissioners were authorised to summon witnesses, and administer oaths; false swearing in any matter within the scope of their powers, being punishable as perjury. Thus the board was clothed with extensive judicial powers: and why ? Undoubtedly, that there might be a final and conclusive settlement of all disputes, before the patents should be issued. A civil war had raged between the claimants under Connecticut, and those under Pennsylvania ; and to give peace to this quarter of the State, on terms that would insure its continuance, was the motive which induced the extraordinary interference of the legislature, whose acts on the subject, are to be considered as statutes of repose. The object was not to be attained, without exertion and perseverance; nor, in many instances, without hardship, or even injustice, to individuals. The latter was anticipated'; but to obviate it altogether, was, in comparison with the pacification of the country, a minor object: sacrifices, 6n all sides, were inevitable; and the Legislature made suCh provisión on the subject, as circumstances permitted. The business languished in the hands of several sets of commissioners, and fears were entertained, that the project, fróm its'magnitude, and the difficulties with which it was surrounded, would entirely fail. In truth, it'was to the extraordinary energy'and abilities of' Judge Cooper,' (a gentleman of' the last commission, which at length cut its wáy through' all impediments,) that its eventual accomplishment is due. Much of the difficulty arose from deficiency of means in tracing the titles from the original holders. ' The Connecticut claimants had disavowed the jurisdiction of Pennsylvania altogether; and consequently, before the year 1774, when they were incorporated by Connecticut,- as a town, which was at first annexed to the county of Litchfield, but afterwards, in 1776, erected into a separate county, by the name of Westmoreland, there was no office among them for registering deeds or wills, nor any means of recording the descent of land, in' cases of intestacy; and when, after the jurisdiction of Connecticut had been extinguished by the Decree of Trenton, the present county of Luzerne was erected, Connecticut titles were not *101 recognised by our laws, and their registry was strictly forbidden. The evidences of transfer, therefore, necessarily depended on documents in the custody of individuals; on the minutes of the Susquehanna Company ; on the Westmoreland records, which embrace a period of only eight years, (from 1774 to 1782,) and on the recollection of witnesses. The Wyoming massacre, which depopulated the country in 1778, materially lessened these sources of information. Many of the inhabitants who fled to Connecticut, on that event, were deterred from returning, at the peace, by the Decree of Trenton, and the rigorous measures which Pennsylvania thought proper to adopt; and seem for some time to have abandoned their claims, and the country, together. This state of things, necessarily rendered the establishing of a complete chain of title, in many instances, impossible. But every thing was done by the board, that could lead to the discovery of truth. Ample time and opportunity were allowed to claimants to establish their titles; and the instances in which disputes were actually litigated, in which witnesses were examined, and counsel heard, are neither few nor rare. Every one had a fair opportunity to establish his claim, and if he failed, it was either because the claim in reality hád not merits, or he was prevented' by misfortune, or want of preparation, from disclosing them. Where the parties actually appeared, there can be ho colour of reason, why the loser should not be concludedfor the commissioners, where the matter was submitted to their judgment, had the same power to máke a final decree, that the Common Pleas had, where the matter Was submitted to that Court in the first instance. This seems to'be' conceded in Enslin v. Bowman, 6 Binn. 462 ; and in truth, it is strictly conformable to every principle, not only of law, but of- justice, that the judgment of a Court of competent jurisdiction, directly on the point, should be conclusive on the same matter again coming incidentally into question. 'It would be monstrous in principle, as well as disastrous in its consequences to this part of the State, if, after having submitted to an examination by the commissioners, in which every thing was heard and weighed ; if after a patent was actually issued; and after all light on the subject was extinguished by a lapse of sixteen years, a Connecticut claimant should be permitted to try his fortune in Court, when, if he did not mean to abide by the *102 judgment of the commissioners, he should have carried his cause to Court, in the first instance. The Legislature never intended to allow him a double chance1 of success. The only thing that can afford a plausible ground of distinction in this particular case, is, that when the certificate was granted, the defendant below was an infant, residing out of the State, and without notice of the proceedings. But in none of the acts on the subject, is there any saving or provision for the usual cases of disability, nor could there be: the objects to be attained, were of a nature too urgent to await the removal of disabilities of any kind; and the want of actual notice is immaterial. Before a controversy had actually arisen, who was to give it? And while an adverse claim remained dormant, perhaps its existence unsuspected, who was to receive it ? The commissioners were to “ ascertain all the rights or lots which had been occupied or acquired by Connecticut claimants, and make out certificates therefor.” Hence, their proceedings being not in personam, but. in rem, every person interested, was bound to take notice at his peril: they had nothing to do with litigant parties, till litigant parties appeared. From the mass of business cast on them, it is not to be supposed, that the commissioners should in no instance, have fallen into error, or have been imposed on; but where individual wrongs have been suffered, they are to be considered as necessary sacrifices, by distributive justice, to the accomplishment of a great state object. It is a sound principle of law, that where a party has had an opportunity of being heard, he shall be considered as having been actually heard; into a departure from which we ought not to be decoyed, by even a strong case of apparent fraud, the correction of which, in particular instances^ would be greatly overbalanced in point of advantage, by the flood of uncertainty and litigation that would be let in. The certificate, therefore, unless where there has been an arrangement between the parties, to have the patent taken out in a particular way, or some agreement to raise a trust, cannot be impugned; but the decision of che commissioners, in an adversary proceeding, is to be taken as conclusive.
Judgment affirmed.