Bland, Chancellor.
This case standing ready for hearing, and having been submitted, the proceedings were read and considered.
Whereupon it is Decreed, that for the payment of the debts, and the execution of the trusts as specified in the last will and testament of the said late William Campbell, the said John McHenry and Edward Campbell, the trustees named and appointed by the said testator, forthwith proceed to make sale of the property and estate of the testator, according to the directions of his last will and testament, in such manner, and upon such terms as they may deem most advantageous to all parties concerned therein. And if the sale of all the lands of the testator lying in Baltimore county should not produce a sufficient amount, together with the debts due to him, to satisfy all the debts due by the testator, that then the trustees, for that purpose, forthwith proceed to make sale of the square in Fredericktown, the Tontine shares, and the ten Potomac shares, as specified in the testament of the deceased, or so much thereof as *212 may be necessary; and if there should still be a deficiency, that then as much of the testator’s property lying in the city of Washington be sold as may be necessary to supply the deficiency. And the money arising from the sales shall be applied by the trustees to the payment of the debts due by the testator, and according to the uses and trusts specified in his last will and testament. And the sales of the testator’s estate, which were made unto Warner War-field and unto James Hood, as set forth in the proceedings, are hereby approved, and each of the said contracts is hereby directed to be executed and completed upon the terms expressed in the proceedings. And it is further Ordered, that Edward Campbell, one of the said trustees, shall, as soon as conveniently may be, return to this court a full and particular account of his proceedings relative to the sales stated to have been made by him, and of the amount of the purchase money received by him, and whether he has the same now in hand; and if not, how and in what manner he has disposed of or distributed the same in execution of the trusts reposed in him, with an affidavit of the truth thereof.
The plaintiffs Cunningham and wife, by their petition, founded on the act of assembly in regard to such matters, (a) represented, that the estate of the late William Campbell, which by the decree of the 7th of October, had been ordered to be sold by these testamentary trustees, was very large and valuable; and that it was necessary for the safety of those interested, that the trustees should give bond with surety for the faithful performance of the trust; whereupon they prayed, that the trustees might be ordered to give bond, &c.
3d July, 1826.
Bland, Chancellor.
Ordered, that the trustees Edward Campbell and John McHenry, on or before the twenly-first day of August next, execute and file with the register, their bond to the state in the penalty of $100,000, with surety or sureties to be approved by the Chancellor, for the due execution of the trust reposed in them, or shew good cause to the contrary; provided, that a copy of this order, together with a copy of the foregoing petition be served on them, on or before the twenty-fourth instant.
A copy having been served as required, and no cause having been shewn, the matter was again submitted to the court.
*213 30¿A September, 1826.
Bland, Chancellor.
It appearing that the order of the third of July last had been served, and no cause having been shewn or security given as required, — and it thus appearing to be necessary for the safety of those interested in the execution of the trusts mentioned in the last will and testament of the late William Campbell, that the trustees should give bond with surety for the due execution of the same, — It is therefore Ordered, that the trustees, John McHenry and Edward Campbell, be and they are hereby removed and displaced so soon as the trustee hereinafter named, shall have given bond as required. And it is further Ordered, that John I. Donaldson be and he is hereby appointed trustee under the last will and testament of the late William Campbell, in the place of John McHenry and Edward Campbell; but, before the said Donaldson shall act as such, he shall give bond wilh surety to be approved by the Chancellor for the due execution of the said trust in the penalty of $100,000, which bond shall be made payable to the state, and filed by the register and recorded as required, by the act in such case made and provided. (b)
After the trustee, appointed By this order, had given bond as required, he brought the case again before the court, for the purpose of obtaining an account and possession of the estate which had been thus committed to his administration.
10th October, 1826.
Bland, Chancellor.—
Ordered, that John McHenry and Edward Campbell, the trustees who have been displaced by the order of the 30th of September last, be and they are hereby directed, on or before the 1st day of January next, to make a report to this court of all and singular the money or property which, by virtue of the trust reposed in them, by the last will and testament of the late William Campbell, may be now in their hands or possession, or have been in their hands or possession, or either of them; or which has been disposed of by them or either of them; with a full and particular account of all sales, receipts and disbursements, made in their joint or respective capacities of trustees. And it is further Ordered, that they and each of them, be and are hereby directed and required forthwith to pay and deliver over unto the said trustee John I. Donaldson, all money and property which they or either of them may have in their or either of their hands or possession, by virtue of the said trust. Provided, that a *214 copy of this order be served on the said John McHenry, and on the said Edward Campbell, on or before the 1st day of November next.
For the purpose of enabling the court to make a just and equitable distribution of the assets of the testator, among his creditors, on motion of the trustee, the case was submitted to obtain an order for giving them notice to bring in their claims, the vouchers of some of whose claims had been filed on the 22d of January,1824, with the original bill.
24¡7i January, 1827.
Bland, Chancellor.
Ordered, that the creditors of William Campbell, late of Frederick county, deceased, file the vouchers of their claims in the chancery office, within four months from this date; and that a copy of this order be inserted once in each of three successive weeks in one of the Annapolis, Baltimore, and Fredericktown newspapers, before the 10th day of March next.
This order was published as directed; and John Baltzell, on the 16th of Febuary, 1827; E. II. Rockwell, on the 6th of March, 1827; and George Bowles, on the 12th of May, 1827, filed the vouchers of their claims as creditors of the testator.
The trustee, Donaldson, by his several reports, stated, that he had received from the Washington Tontine company, $1,556 27, being the amount of a dividend of $20 75 per share, on seventy-five shares of that stock, held by the testator; upon which he was allowed a commission of $78 74. And he further reported, that he had sold two of the lots in the city of Washington, for the sum of $686 37, which sales were finally ratified, on the 14th of September, 1827. And he further reported, that he had received of Benjamin Dorsey, $42215, being the balance of the purchase money of the land sold to him; for which he had executed to him a deed: from Warner Warfield, $800, on account of his purchase: from Joseph Forrest, $102 : and from Col. Beaty, $198 20, on account of rent of property in the city of Washington; amounting in all to $1,522 35; upon which he was allowed a commission of $74 20. And he further reported, that he had received of Warner Warfield, for the lands sold to him, the sum of $2,600; upon which he was allowed a commission of $100.
The auditor reported on the 4th of August, 1827, that he had, at the instance of the trustee, made a statement of the claims of creditors against the estate of the deceased, amounting to *215 $50,860 65; but, as it appeared, that some payments had been made by the former trustees, no distribution could be made until the evidence of those payments should be produced.
The plaintiffs, Edward Campbell and Cunningham and wife, by their petition, filed on the 11th of December, 1827, stated, that on the petition of the devisees and heirs of the late William Campbell, the General Assembly had, on the 1st of March, i§26, passed a private act authorizing the Chancellor, on the application of any person interested, and on being satisfied that it would be beneficial to the creditors and others interested in the estate, to appoint a trustee with power to mortgage the real estate of which the late William Campbell died seized, or any part of it, for such sums, and on such terms as he might deem most advantageous to all concerned ; and that the trustee so appointed, should give bond with surety for the faithful performance of his duty, (c) And these petitioners further state, that the plaintiff Randolph Campbell, was then dead intestate, and without issue; that Charles Campbell still continued to be of unsound mind, and was then in the hospital in Philadelphia, without hope of recovery; and the petitioner Cathe *216 riñe, as the devisee, who, by the will of her father, was to take on his behalf and after him, considered this petition filed as well on his hehalf as her own; that these petitioners had, in pursuance of the intention of the testator, been put into possession of the real and personal estate devised in trust for their use; and that the creditors were so pressing, that the petitioners were apprehensive that the estate in their hands might be taken from them; and that they might thus be left without the means of support. Upon which they prayed, that a trustee might be appointed as authorized by the act of Assembly, See.
With this petition the trustee Donaldson filed his affidavit, in which he states, that he had advertised two public sales of the estate; and had only been able to effect a sale of the two lots in Washington as before reported by him; that he believed no sales could now be effected, except at ruinous sacrifices; and that by the statement of the auditor there were debts due to the amount of $50,860 65, which, he understood, might have been reduced $8,000 or $10,000 by payments which had been made.
12th December, 1827.
Bland, Chancellor.
Decreed, that John I. Donaldson be and he is hereby appointed trustee with full power and authority to mortgage the real estate of which the said William Campbell died seized, or any part thereof to such person or persons and for such sum or sums, and on such terms and conditions as he may deem most advantageous to all persons interested in the estate; provided, that the said trustee before he proceeds to the execution of his trust, shall give bond with surety in the penalty of fifty thousand dollars, See.
James Cunningham and Catherine his wife, two of the plaintiffs in this case, by their petition to the Chancellor, set forth, that Charles Campbell, of Frederick county, had been for some years, and then was in a state of great mental weakness and unsoundness of mind; rendering him incapable of managing himself or his property; that he never had been married; and that the petitioner Catherine his sister, and Edward Campbell his brother, were his next of kin. Upon which it was prayed that a writ de lunático inquirendo might be issued. With this petition there was filed an affidavit, made on the 15th of December, 1827, before the mayor, and certified under the seal of the city of Philadelphia, by the attending physician of the' Hospital of Philadelphia stating, that Charles Campbell had been for several years, and then was in that *217 hospital in a state of insanity, and incompetent to the management of his affairs.
26th December, 1827.
Bland, Chancellor.
Of the sufficiency of the evidence of insanity, on this application, there can be no doubt; and there seems to be as little room to doubt the identity of the person, particularly when this petition and affidavit are taken in connexion with the proceedings which have been had in relation to the estate of the late William Campbell. There is then sufficient ground upon which to award the writ as prayed.
With regard to the county to which it must be directed; it is, in general, proper, and may, in some cases, be indispensably necessary, that the person alleged to be of unsound mind should be brought before the jury who are convened by the sheriff to ascertain his intellectual condition. And for that reason the writ is almost always directed to the sheriff of the county in which the person said to be insane resides, or may at the time be placed. But if he is out of the state at the time, or it is impracticable, or, as in this instance, it would be attended with great inconvenience and injury to the afflicted person, to have him brought before the jury, his actual presence may be dispensed with, and the writ may be directed to the sheriff of the county in which he last actually resided, or in which the principal part of his estate lies. (d)
Therefore, in this case, let the writ de lunático inquirendo issue as prayed, directed to the sheriff of Frederick county.
The writ was issued accordingly, and an inquisition was taken in the usual manner, and returned on the 8th of January, 1828, by which the jury found, that Charles Campbell was a lunatic on the 15th of December, 1827, and was then in the hospital at Philadelphia ; and did not enjoy lucid intervals, so that he was not sufficient for the government of himself and property; that he had been in the same state of lunacy from the 19th of March, 1819; and that Edward Campbell and Catherine the wife of James Cunningham were his brother and sister, and nearest of kin, &c.
10th January, 1828.
Bland, Chancellor.
Ordered, that the said return be and the same is hereby ratified and confirmed. And it is further Ordered, that the care, custody and charge of the person, and of the estate of the said Charles Campbell be and the same is hereby committed to James Cunningham, of Frederick *218 county: Provided, that before he acts as such committee he shall file with the register' a bond to the state, executed by himself and a surety or sureties to be approved by the Chancellor, in the penalty of two thousand dollars conditioned for the faithful performance of the trust reposed in him by this or any future order in the premises; and to account for and deliver up the estate and property of the said Charles Campbell when lawfully required.
The committee appointed by this order accepted the trust and soon after gave bond accordingly, which was filed and approved, (e)
The trustee Donaldson reported, that he had sold a square in the city of Washington for the sum of $3000, one-fourth of the purchase money to be paid in cash, and the residue in one, two and three years; which sale was finally ratified on the 4th of September, 1828. And he further reported, that he had contracted to mortgage a part of the estate of the testator, upon the terms specified in the deed then exhibited, which he submitted for the confirmation of the Chancellor.
15¿/i June, 1830.
Bland, Chancellor.
Ordered,, that the proposed terms as specified in the deed exhibited by the trustee be approved, and that he execute a mortgage accordingly.
On the 14th of February, 1829, Richard Harwood of Thomas, and Henry H. Harwood, administrators of Benjamin Harwood deceased, for themselves and in behalf of the other creditors of the late William Campbell, filed their bill in this court against Edward Campbell, John McHenry, James Cunningham and Catherine his wife, William C. Cunningham, James Cunningham junr., Rebecca Cunningham, Charles E. Cunningham, George Cunningham, Charles Campbell and John I. Donaldson.
This bill after setting forth, in substance, all the circumstances as herein before detailed, states, that the late William Campbell was, at the time of his death, indebted to the amount stated to the intestate of the plaintiffs, which debt yet remains unsatisfied; that the trustees and executors, these defendants Edward Campbell and John McHenry, made sale of large portions of the estate of *219 their testator; the proceeds of which they have not applied in satisfaction of his debts; that the trustee, the defendant Donaldson, had not yet accounted for the sums received by him; and that the personal estate together with so much of the real estate as had been devised to be sold was wholly insufficient to pay the debts of the testator. Whereupon it was prayed, that the executors, and the several trustees might be ordered to account for the properly and the several sums of money disposed of and received by them; and that so much of the real estate of the testator as had been devised to these defendants, his children and grand-children, as would be sufficient for the payment of his debts might be sold for that purpose, &c.
The defendant Charles Campbell, by his committee, James Canningham, answered and admitted the matters as set forth, so far as they were within his own knowledge; but he insisted, that all the lands devised to be sold should be first disposed of before any other portions of the real estate should be ordered to be sold; and also, that no part of that which had been devised to him the lunatic, and which constituted his only means of support should be sold, until a full account had been taken of the funds which had passed into the hands of the trustees.
The infant defendants, children of the defendant Catherine, answered by their guardian ad litem, and admitted the circumstances as set forth in the bill; but they insisted, that the lands devised to be sold, should be first applied in satisfaction of the debts; and they also insisted, that the act authorizing the Chancellor to appoint a trustee to mortgage the estate of the testator, and the proceedings under it, having passed with the full knowledge of the plaintiffs, and without any opposition from them or any other of the testator’s creditors, this court had no power to set aside and disregard that law, and the decree under it; and to order a sale of the estate as if no such proceedings had been had.
The trustee, Donaldson, put in his answer, in which he admitted all the matters set forth so far as he was concerned. The other defendants having been summoned, and having failed to answer, an interlocutory decree was passed against them, under the act of Assembly; (f) and a commission to take evidence was issued and returned in the usual manner.
*220 The solicitors of the parties, on the 25th of July, 1829, filed an agreement in the following words: ‘It is agreed, that this cause shall remain in its present state until September term; and unless some other agreement shall be entered into before that time, that such decree shall then be entered as may appear agreeable to the course of the court, upon the case made by the bill and answer now filed.’ No other agreement having been entered into, the case was submitted, with a consent by the solicitors of the parties, except the defendant McHenry, that a decree, as proposed, should be passed.
31s£ October, 1829.
Bland, Chancellor.
The agreement under which this case has been submitted, is conclusive upon all the adult parties to the suit, except the defendant John McHenry, who is not a party to it; but he, being in default for not answering, may on the proceedings and proofs, be considered as having waived all objections to the plaintiff’s obtaining the relief asked by the bill.
In regard to the lunatic and the infant defendants, it is clear, that their interests cannot be bound by any special agreement; and, therefore, although a committee or guardian ad litem, of a lunatic or infant may, in a regular course of proceeding, in some ■cases, consent to a decree; (g) yet as to them, in this instance, the ■court must found its decree upon other and better ground than that ■of a peculiar agreement by which adult and sane persons alone are competent to bind themselves.
According to the general course of the court, all cases must be regularly set down for hearing before either party is allowed to call for a decree. But in creditors’ suits the course is somewhat different. In such cases, to prevent delay, and as so much is to be done after the funds have been brought into court, and every thing may be so easily set right, by further directions, it has long been the established practice here, as well as in England, in all such cases, where the whole, or a part of the plaintiff’s claim, as designated in the bill, has been distinctly established or admitted, as specified; and it is shewn or confessed, that the personal estate has been exhausted, or is insufficient, at once to pass a decree, directing the real estate to be sold, without waiting for the case to be fully prepared for a final close, or to be regularly set down for hearing. (h) And this being a creditor’s suit, a decree for a sale may, *221 therefore, be passed before the case has been regularly set down for hearing, provided there be no other impediment to the passing of such a decree.
*222 Although the property of a lunatic cannot, either by a court of common law or equity, be removed beyond the reach of his crédi *223 tors; or be prevented from being taken and applied in satisfaction of his debts; yet in most cases, -where a creditor of a lunatic *224 applies to a court of equity for relief, the estate of the lunatic will be preserved for his support if practicable, so as to prevent the burthen of maintaining him from being thrown upon the public, and the rents and profits only applied in satisfaction of his debts, so as to leave to the unfortunate person a maintenance out of his own estate, at least during his lunacy, postponing the debts as an incumbrance upon his estate to be satisfied after his death or recovery. (i) In England, though land is not generally liable for debt, yet where on application by the creditor of a lunatic, it is shewn to be necessary to make sale of some of his property for the payment of his debts; and it appears, that his maintenance would be better provided for, and his advantage promoted, by disposing of a real estate inconvenient, ill conditioned, &c.; that it would be for his benefit so to pay his debts, and keep together his personal estate, the court has no difficulty in ordering a sale of such realty, (j) But here lands being in all cases liable for the payment of debts, without denying to the Chancellor here, as in England, the power to consider the advantage of the lunatic, as far as practicable, it is made the duty of the court, on application, to order the lunatic’s real or personal estate, to be sold for the payment of his debts, (k)
In the case of infancy, however, it was a general rule of the common law, affirmed and enlarged by legislative enactment, that where the right to the real estate of an infant was attempted to be questioned or charged, that the parol should demur, or, in other *225 words, that the judicial proceedings should be stayed until he attained his full age. (l)
But it must be recollected, that this is a creditor’s suit, as to which it is expressly declared, that where any person dies without leaving personal estate sufficient to discharge his debts, and shall leave to descend, or shall devise real estate to a minor or lunatic, the Chancellor shall have full power upon application of any creditor of the deceased, and after summoning and hearing the infant or lunatic, by guardian or committee ; and the claim of the creditor has been fully established, to order the real estate of the deceased to be sold for the payment of his debts, (m)
In this instance, the claim of these plaintiffs, as designated, has been admitted, and the insufficiency of the personal assets for the payment of that claim has also been distinctly admitted ; and, therefore, upon these admissions, which the committee of the lunatic, and the guardian ad litem, of the infant were competent to make; since the answer of a lunatic by his committee may be read against him, as an answer of one of full age and sound mind, (n) And the answer of an infant by his guardian ad litem, at least in cases of this kind, may be read against him also, as if made by him when of full age; (o) there can be no doubt as to the power and duty of the Chancellor immediately to decree a sale of the real estate for the payment of the debts of the deceased, without regard to any postponement or delay to which a lunatic or infant was formerly entitled, or with which they might otherwise have been indulged.
All real estate in Maryland has been made subject to be taken and sold for the satisfaction of the debts of its owner; yet that has not in any manner affected the debtor’s right to alien, or devise it bona fide, in any way he may think proper. It has, however, been declared by statute, that all devises in fraud of creditors, shall be deemed void; (p) that is, where the debtor devises his real estate to any one, without leaving a sufficiency in the hands of his heir, or executor, to pay his debts. Yet, if a testator devises real estate for the payment of his debts, in a way that may be sufficient and effectual for that purpose, it will not be affected by this statute. *226 But, if the real estate set apart by the testator for the payment of his debts be insufficient, or be given in such a manner as to be ineffectual, then it will be considered as coming within the meaning of this statute, and be deemed void. Otherwise the creditors must take that real estate of the deceased debtor which he has devised for their benefit, and none other. (q)
Here it is alleged and admitted, that the whole of the personalty, together with the real estate, devised by this testator to be sold for the payment of his debts, is wholly inadequate for that purpose. There being, then, an admitted deficiency of the devise for the payment of debts, it falls within the operation of the statute, and must be deemed, as against creditors, absolutely null and void. The case being thus cleared of all embarrassment by reason of that devise, it follows that the real estate of this deceased debtor must be dealt with, in all respects, as if he had made no provision whatever for the payment of his debts, since an inadequate or ineffectual provision is as if none had been made.
But, in behalf of the infants, their guardian objects, that the before mentioned private act of assembly has prescribed a mode whereby the debts of their ancestor are to be satisfied from the estate devised to them; and, therefore, that these creditors cannot be permitted to obtain satisfaction in any other manner.
This objection seems to have been thrown into the answer of these infants, rather by way of an appeal to the indulgence of the court, than with any great degree of confidence in its validity as a bar to the relief claimed by the bill. But when it is recollected how many private acts of this description the general assembly have passed, and how often they have been tempted or urged, by generous feelings or by considerations of the difficulty and hardships of the case, by such enactments, apparently to step beyond the limits assigned to them by the constitution, or to trench upon the confines of the judiciary, it may be well to investigate this matter somewhat more attentively than might otherwise be deemed necessary.
This mode of granting relief in particular and anomalous cases by legislative enactments, is said to have prevailed in England as far back as the beginning of the fifteenth century, (r) But even in the earliest times, and always since, when the matter was of such *227 a nature as that relief could obviously be had in the ordinary courts of justice, parliament has refused to interfere, and left the parties to apply to the regular tribunals. But where the petitioner could have no relief, without a special enactment in that particular case, or without a general law comprehending it, then the individual application has been considered, and such a private or public act has been passed as seemed most proper; and, in some instances, a private clause has been inserted in a public statute to suit the particular case, so that the statute has been, in fact, both public and private in its several provisions. It appears, too, that the fees for obtaining relief in this way, in England, are taxed like the costs of a suit in the ordinary courts of justice. (s)
A private act of parliament, although strictly and literally followed, as regards the authority and jurisdiction conferred, (t) is in many respects considered and construed as a mere legal conveyance, in general, binding only on those who are parties to it; that is, those who petition for it, or are named in the act itself, and those claiming under them, (u) It is never permitted to affect the *228 interests of strangers, or to defeat the rights of bom fide purchasers for a valuable consideration; because, as to strangers, a private act is considered only in the light of a private conveyance; (w) as where an act gave the lands of Priory’s alien to the king, it was held, that it did not extinguish an annuity of a Prior, which he had out of a rectory; although there was not any saving-in the act; and so too, where a statute makes a conveyance good against the king, or any certain person, it is not allowed to take away the rights of any others although there be not any saving in the act. (x) But where there is an estate in remainder, which the party may bar by a fine and common recovery, in such case, the claimant of such outstanding estate may be bound by a private act of parliament, although not named in it; because the legislative enactment is only another form of effecting that which might have been done by an ordinary course of judicial proceeding, (y)
In a case however, where a private act of parliament was passed authorizing the sale of a real estate, during the infancy of the heir, to pay debts, which directed, that the mortgage should be first paid; and it afterwards appeared, that there were judgments by which the estate was bound prior to the mortgage ; it was nevertheless held, that the act must be obeyed, and the mortgage first paid. But it seemed to be admitted, that, by virtue of the general saving in the act, the judgment creditors might make use of their incumbrances as they could at law. This determination appears to have been pronounced with some hesitation and reluctance. (z) The parliament, by thus arbitrarily altering the rights of the parties, and ordering the mortgage to be first paid to the prejudice of prior judgment creditors, exerted a kind of supreme power, which it has been declared, should never be exercised upon any occasion, and was too dangerous to be entrusted even to that body, (a) No court of justice, of England, has ever ventured to assume such a power, in any form; for as it has been said, men’s deeds and wills, by *229 which they dispose of their estates, are laws which they are allowed' to make, and which are not to be altered even by the king in his courts of law or conscience. (b)
It has been held in England, that a private act of parliament which had been obtained by fraudulent suggestions, or by a suppression of the truth, might, on that ground alone, be relieved-against by any court of law or equity in which the fraud could be fully and clearly shewn. As was done in a case in the High Court of Chancery of England, before our revolution, in which an act of the legislature of the then province of Pennsylvania was, about the year 1725, set aside on the ground of its having been? obtained by fraudulent suggestions, (c) And so too,- in some other cases, where private acts had been passed by the parliament of England, upon false suggestions, they were, upon that ground alone, vacated by the Court of Chancery on a bill filed- by the party grieved. (d)
It seems to be generally admitted, in England, that the rehearsal or recital of general and public facts and circumstances in a statute cannot be denied; such as the rehearsal in the' statute de donis of what was the common law before the passing of that act, (e) or the recital in a statute, that great outrages had been committed in a certain part of the country; and that therefore the statute was *230 passed. (f) Such statements of facts, of a public nature, upon which the government had acted, must, for all such public purposes, be taken to be true. But then no particular fact can be assumed or declared by the legislature to be true so far as to affect the rights of a person, or the title of an individual to any property. Not because it would be indecent or improper to question the motives or purity of the legislative body, who must always be presumed to act rightly and to set forth the truth, until the contrary is clearly shewn; but because, in all such cases, it may, without any impeachment of their integrity, be presumed that they have been misled or misinformed. As where a statute recited, that a certain person had been attainted, when in truth such was not the fact, the party was not thereby concluded and prevented from shewing the truth, (g) And so where the preamble of an act of parliament recited, that the plaintiff’s father had not been married, yet he was allowed to prove that he had been married; and so to obtain a verdict, founded upon the fact of his legitimacy, in direct opposition to the recital in the act of parliament. (h) But the parliament of England, on principles of state policy, not applicable to cases of a civil nature, have, in many instances, passed bills of attainder, by which facts have been assumed to be true, without the formality of proof, and individuals have been attainted, condemned to death, and their estates confiscated without even calling on them to answer. It cannot be denied, that for all such purposes, that that legislative body has the power to assert the truth of any facts to the destruction of an individual without leaving to him the means of controverting what had been thus asserted in any judicial manner or form whatever. (i)
Even in England there are many cases in which the courts of justice found their judgments upon considerations of public utility, looking to politics, or that which is deduced from the frame of the government of the country, (j) Here it has become very common of late to speak of the sovereign power, and of the sovereignty exercised by our government. These words do not, however, occur either in the constitution of this state, or in that of the Union, The words sovereign and sovereignty refer to him, or that body of men who possess the supreme power of the state; who *231 have no superior, and who hold the supremacy, the highest authority at discretion and without responsibility. In England the monarch alone wears ‘the golden yoke of sovereignty.’ All discretionary and irresponsible power belongs to him only; except in so far as it has been expressly chartered out by him to the parliament or the judiciary, (k) When the king and the parliament, however, unite, they are indeed clothed with a sovereignty which is, to the extent of all human power within the range of their jurisdiction, altogether omnipotent. Yet it has been held in England, as well as in this country, that if a legislative enactment, owing to some oversight or mistake of its makers, directs that to be done which is palpably absurd, unnatural, unjust or impracticable; as that a party should sit as judge in his own cause; or that a penalty should be imposed upon those who should not propagate slander, instead of upon those who should do so; (l) or that those should be punished who should pass as true a forged note issued by a bank, instead of those who should pass a forged note purporting to be a note issued by a bank; (m) apart from any constitutional restriction, must be regarded as absolutely void; on the ground of its being impracticable innocently to execute it; because of its obscurity, absurdity, repugnance or injustice, (n)
But the government of this republic has been clothed with no such sovereign power, or sovereignty as that of England, either altogether, or in any of its departments. Taken collectively, or in any of its several parts, it is most truly and strictly made up of responsible and delegated power • it is not, in any sense, sovereign, or a sovereignty. For, wherever the law expresses its distrust of abuse of power, it always vests a superior coercive authority in some other hand to correct it; the very notion of which destroys the idea of sovereignty, (o) Our’s is a government assumed under the authority of the people; it originated from the people, is founded in compact only, and instituted solely for the good of the whole; and all persons invested with the legislative or executive powers of government are the trustees of the public, and as such *232 accountable for their conduct, (p) These are our fundamental axioms and first principles; consequently, the general assembly, or all, or any portion of our government cannot exercise sovereign authority, in any case, over any subject whatever; since it is clear that, when regarded in this point of view, our whole government must be considered as strictly limited, as well by its general nature, as by the special provisions of the constitution itself. Here, therefore, the sovereignty belongs altogether and exclusively to the people of the state. (q)
It is declared, that the legislative, executive, and judicial powers of government ought to be forever separate and distinct from each other; (r) that -no state shall pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts; (s) and that no freeman ought to be taken, or imprisoned, or dis-seized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner destroyed, or deprived of his life, liberty, or property, but by the judgment of his peers, or by the law óf the land, (t) Consequently, the general assembly must be considered as restrained, not only by the general principles and delegated nature of the government itself, from exercising any arbitrary power over the rights or property of an individual; but according to this declared separation of powers, and under the positive restrictions by which its powers are limited, it can exercise no authority which is manifestly beyond the confines of its own legitimate sphere as a legislative department, (u) It cannot adjudicate upon any matter in the manner of a court of justice; (w) it can make no partial distinctions among citizens, (x) or pass any law impairing the obligation of contracts; nor can it be allowed to assume the truth of any facts upon which of itself to pronounce a judgment, or to direct the judiciary to do so in any manner, so as onerously or destructively to affect the rights of any one; or, by passing or repealing any law, to deprive any one of a previously vested right of property, (y) And looking to the delegated and *233 very limited nature of our government, as compared with that of England;/itmay be confidently affirmed, that this court would be acting entirely within the range of its unquestionable authority, in going fully as far as the English tribunals have gone, in controlling all legislative enactments, in relation to private property; by disregarding the facts assumed in the enactment, when found to be untrue; by setting such legislative enactments aside when obtained by fraud; and by confining their operation, so as to prevent them from impairing the obligation of contracts, or affecting the rights of purchasers, or the interests of third persons who are strangers to them. And in treating all special and private legislative enactments as a sort of conveyances which can only be allowed to bind those who are parties to them by having asked for or assented to their passage, (z)
Where it appeared, that, in consequence of a misrepresentation to the general assembly, the party had obtained that which he could not have obtained on a fair and full statement of facts; that he had not only concealed facts, which, if known, would have defeated his purpose; but had suggested a matter which he knew to be contrary to the truth. It was held by this court to be inconsistent with reason and justice to suppose, that, because the defendant’s patent was sanctioned by an act of the legislature, his title must be clear and indefeasible; and that the court was precluded from an examination of the circumstances alleged in the bill. That the legislature, not being constituted for the investigation of facts, relative to the rights of individuals, or of matters in controversy between private persons, it never could be admitted, upon any sound principle of justice, that any allegation or matter of fact assumed in a legislative enactment should be considered as incontrovertible by any one not a party to it. For even if the legislature should be deemed a tribunal competent to the examination of facts, and that too from which there should be no appeal, it was certainly an universal rule, that no man should be affected by a decision to which he was neither party nor privy, (a) Nor is the truth of any fact thus assumed in an act of one general assembly, considered as at all conclusive upon their successors. As where it had been asserted, that the object contemplated by the act incorporating The Potomac Company had been accomplished; (b) the truth of that *234 fact was virtually denied by the act of a succeeding general assembly, which allowed the further time of ten years to accomplish the object, (c)
In Maryland private acts of assembly have been common, from the earliest period of the proprietary government, (d) down to the present time, and it has been laid down as a general rule that all petitions praying for such enactments must be couched in decent and respectful terms, (e) It appears, that under the provincial government; and even since the revolution, certain fees were, here as in England, paid by the applicants for sueh acts to the officers of the general assembly by whom they were passed, (f) But the allowance of fees for the passage of any such laws has, long since, been discontinued. It also appears, that although it has been deemed necessary to adhere closely to the express provisions of all such special enactments, in so far as they confer any new power or jurisdiction; yet that, here as in England, they have, in many respects, been construed, and executed as mere conveyances, binding only upon those who are parties or privy to their passage, (g) It is certain, that in so far as the provisions of any private act are confined within the constitutional competency of the general assembly, they must be considered as binding and effectual as those of any constitutional public law. And it may be admitted, that the general assembly has the power, in many cases, to lend its aid to an agreement between individuals, so as to render it effectual, when any merely public reason or positive rule of law stands in the way; as to enable a body politic, or particular persons to levy contributions, to a certain extent, for some special purpose connected with the public good; (h) or it may sanction an encroachment which had been made upon a public right, through misapprehension ; as by allowing an individual to continue to hold as his own a part of a street upon which, by mistake, he had erected his *235 house ;(i) or the general assembly may, without prejudice, and for beneficial purposes, lend its aid to supply defects in an agreement which could not be supplied by any judicial proceeding without the help of such an enactment; although there existed sufficient evidence of the assent of the party; (j) or, it may, without injuriously affecting the interests of any one, but for the benefit of all, authorize a sale, a settlement or the disposition of an estate to be confirmed or made, which was impracticable, according to the established rules of law, by reason of the infancy, (k) the coverture, (l) the lunacy, (m) or the alienage (n) of one or more of the parties concerned; or it may, without prejudice, authorize the making of leases; (o) or the execution of a power; (p) or the making provision for a wife or children; or the selling of estates to pay debts or the like, (q)
A contract of marriage is, in many respects, so highly important in its nature as not only to involve the interests- and happiness of the immediate parties, and to require the free consent of a man and woman who have a perfect bodily (r) and mental capacity to contract ; (s) but, it is a contract to which society is a party, and in which it has a deep interest; and on that account it is, perhaps, that a marriage, which has been fairly and legally consummated, cannot be dissolved by a judicial determination, founded on any subsequent breach of its terms, without the consent of the community expressed by its representative legislature, or by the supreme authority of the state. The spiritual court, in England, and some of the courts of justice of Maryland, have been clothed with authority to determine on the validity of a contract of marriage; yet they cannot divorce, from the bonds of matrimony, for any cause subsequent to the marriage; for, if there has been a valid marriage, those tribunals are not competent to rescind it; so that a *236 sentence of divorce is not so properly a dissolution of the contract as a declaration of its original absolute nullity, (t) Hence, it seems to have been generally admitted, that the constitutional restriction, which declares, that no state shall pass any law impairing the obligation of contracts, does not extend to a contract of marriage; (u) and, therefore, that the general assembly may, by law, grant a divorce from the bonds of matrimony, with all its consequences, or in a limited manner, or upon any terms deemed most proper; (w) or they may sanction a separation, by authorizing the appointment of a trustee to take care of the estate of a fugitive convict for the benefit of his wife and children; (x) or by making provision for carrying into effect articles of separation, (y)
But although children may be thus deprived of capacities, which would have been incident to their legitimacy, and be bastardized, as a consequence of the divorce of their then living parents; (z) yet, in regard to a law, which, without affecting a then existing contract of marriage, or which has been passed after its dissolution by death, declares the issue to be bastards, other considerations arise. Legitimacy is a legal capacity whereby property may be acquired by descent, &c; or, indeed, it may itself be regarded as a valuable kind of property, or a privilege of which the general assembly cannot constitutionally deprive any one, since the legislature cannot so judicially act upon the case as to deprive him of any legal capacity, privilege, or property with which he has been legally invested, (a) But, on the other hand, it may be admitted, that the General Assembly may, prospectively and without prejudice to the rights of others, declare a marriage to be valid, and any bastards to be legitimate, and thus confer upon such individuals a new and additional capacity; upon the same ground, that they may grant to an alien a capacity to take and hold in any case which may thereafter happen in like manner as a natural born citizen. (b)
It may also be admitted, that the general assembly may, consti *237 lutionally, so that it he without prejudice to any one, confirm an anti-nuptial settlement, (c) or cure the defects in any contracts or conveyances, so as to quiet the possessions of purchasers and others. But in doing so, they can exercise no power which has been delegated exclusively to the government of the United States; rior any power properly belonging to the judicial department y nor can they suspend the recovery of debts, or deprive any one of a privilege, or impair the obligation of contracts, or divest any right previously vested so as thereby, in eifect, arbitrarily to take property from one person and give it to another. (d)
With regard, therefore, to the case now under consideration, it follows from what has been said, that this act of assembly, (e) by which the devisees of the late William Campbell have been authorized to mortgage his real estate, can, in no way, be allowed to alter or affect the rights of his creditors. For, mortgaging the assets is not the natural way of paying debts with them; although, in some cases, it may be the most expedient mode; as where a sufficient sum may be raised in that manner to satisfy all the creditors, without delay, and without prejudice to the heirs, devisees, legatees, or next of kin of the deceased, (f) This special act may be admitted -to' be fully, and in all respects obligatory upon those devisees who are parties to it, and at whose instance alone it was passed; but the creditors of the testator, being entire strangers to- it, must be permitted to stand here as if it had never been passed ;/ and to sustain their rights against these devisees, in like *238 manner as if they, the devisees themselves, being competent to contract, had, of themselves, mortgaged the estate devised to them.
The heir of a deceased debtor, at common law, was only bound for the payment of the bond debts of his ancestor, because of the express terms of the obligation, and in respect and to the extent only of real assets descended; which liability of the heir has been, in Maryland, extended by statute in favour of all simple contract creditors, in like manner as to bond creditors, (g) By the common law, if a debtor, instead of suffering his real estate to descend to his heir, devised it to any person; or if the heir aliened the land, before an action was brought against him, the creditor was without remedy. But this injustice has been removed by a statute which declares, that all devises, as against creditors, shall be deemed fraudulent and void, and that the heir or devisee, after any such alienation, shall be liable to the value of the land so by him sold. (h) In consequence of which, and as mere bond or simple contract creditors have no lien upon the real estate of their debtor, the heir or devisee becomes personally liable to the value of the realty by him so aliened, leaving the land in the hands of a bona fide purchaser entirely free from their claims; (i) or such creditors may follow the *239 specific produce of the real assets, and take it from any one in *240 whose hands it may be found, (j) These principles however apply only to cases where an alienation has been made by an heir or devisee before the institution of a suit by a creditor for the purpose of subjecting the real estate of his debtor to the payment of his debts. But to prevent justice from being baffled, and a traffic in litigated titles, no alienation is allowed to be of any avail against the interests of the parties to a Us pendens. To constitute such a lis pendens, in this court, it is sufficient, that there be a bill filed and a subpoena returned served in a suit, the object of which is to affect the right to the estate. During the pendency of such suit, a defendant can, in no way, encumber or sell the estate to the prejudice of a plaintiff wrho may have a claim upon it; or of a party *241 who, as a creditor, may have a right to have it sold as assets to be applied in satisfaction of the deceased’s debts. (k)
In this case, long after a suit had been instituted by these very devisees themselves, to have the real estate of this deceased debtor sold for the payment of his debts, they applied.to the general assembly and obtained this special act, authorizing them to raise money for the payment of those debts by way of mortgage instead of a sale of the realty; which act they did not ask this court to carry into effect for their benefit, until after the creditors of their testator had been publicly notified to come in, and some of them had actually become parties by filing the vouchers of their claims. So far as this private act lends its aid in removing any disabilities or difficulties which had rendered it impracticable for these devisees, of themselves, to apply the estate of the deceased debtor to the payment of his debts, it may be permitted to stand ; but it certainly cannot be suffered to operate so as to hinder or delay creditors in the recovery of their debts, any more than a mere voluntary mortgage, or sale made by an heir or devisee of himself, pending a suit against him, could be allowed to be of any avail, in preventing a then plaintiff creditor from obtaining a decree for a sale for the satisfaction of his claim.
It is clear, therefore, that this private act of assembly, so far as it has been presented as an obstacle to the relief prayed by this bill, can be of no avail, and must be regarded as utterly unconstitutional and void.
On taking a retrospective view of the various proceedings, which have been had, in relation to this estate, and the disposition which has been already made of some of it, for the benefit of the devisees and creditors of the deceased, it is sufficiently obvious, that, to facilitate the further progress of the court in this matter, it will be necessary to consolidate, and have them henceforth considered as one suit, covering all matters within reach of a creditor’s suit, and of a bill filed by the legatees and devisees, for a distribution of the surplus after the payment of debts. And it is also obviously necessary, that these executors and trustees should, all of them, be called to an account. I shall therefore order a sale, consolidate the cases, and direct an account to be taken.
Whereupon it is Decreed, that the real and personal estate of William Campbell, deceased, yet remaining undisposed of, or so *242 much thereof as may be necessary for the payment of his debts, be sold; that the trustee, if practicable, to sell the personal estate, and the real estate devised for that purpose, and the lands in Allegany county, in the first instance: and if sales of the said property cannot be effected, or the proceeds thereof should be insufficient, then he shall sell the remaining real estate of the deceased; that John I. Donaldson be appointed trustee, to make the sale, &c. And it is further Decreed, that the case of Edward Campbell and others, against John McHenry; and the case upon the petition of Edward Campbell and others, be consolidated with and made parts of this case. And it is further Decreed, that John McHenry, Edward Campbell and John I. Donaldson account, &c.
The trustee gave bond as required by this decree, and on the 18th of December, 1829, reported, that he had made some further sales of the deceased’s estate, which sales were finally confirmed on the 27th of February, 1830. After which he reported, that he had, under the decree of the 12th of December, 1827, mortgaged a part of the estate of the deceased, which, no objection being made, was, on the 15th of June, 1830, approved; and on the 5th of May, 1832, he reported, that he had made some further sales, which were finally ratified, on the 6th of July, 1832. On the 7th of May, 1832, the auditor reported a statement of the claims of the creditors of the deceased, who had come in, and a distribution among them of so much of the testator’s estate as had then, in various ways, come to the hands of the trustee. After which the trustee reported, that he had raised some further sums by mortgage, which, without opposition, was, on the 26th of May, 1835, approved. It appears by the proceedings under a petition filed in the same case on the 2d ,of March, 1836, that all the children of the testator William Campbell were then dead; and that the case had so abated.

 1785, ch. 72, s. 10.

 1785, ch. 72, s. 10.

 An act to authorize the appointment of a trustee or trustees, with powers to mortgage certain real estate, for the purposes therein mentioned.
Whereas, it is represented to this General Assembly/that William Campbell, late of Frederick county, deceased, was, at the time of his death, seized and possessed of considerable real and personal estate, and was indebted to a very large amount; that the estate which he left is greatly more than sufficient to pay his debts, if a sale of said property could be effected on reasonable terms; but at this time, it cannot be sold without a considerable sacrifice. JAnd, whereas,-the devisees and heirs at law of the said William Campbell have petitioned this General Assembly for a law to authorize them, or some person for them, to raise a sufficient sum of money to pay the debts due by the said William Campbell, by mortgaging the real estate of which the said Campbell died seized. Therefore,
Be it enacted by the General Assembly of Maryland, That the Chancellor of Maryland, upon the application of any person or persons interested in the said estate, and upon being satisfied that it will be beneficial to the creditors and other persons interested in the said estate, be, and he is hereby authorized to appoint a trustee or trustees, with power and authority to mortgage the real estate of which William Campbell, late of Frederick county, died seized, or any part thereof, to such person or persons, and for such sum or sums, and on such terms and conditions as he, she, or they may deem most advantageous to all the persons interested as aforesaid in the estate of the said William Campbell. Provided, That the trustee or trustees, so appointed, before he, she, or they proceed to the execution ofthe trust, shall execute a bond to the state of Maryland, with such security as the Chancellor shall require, conditioned for the performance of said trust, and for the faithful application of the sum or sums of money which may be received from the mortgage of said estate, to the payment of the debts due by the said William Campbell previous to his decease.— 1825, ch. 135.

 Exparte, Southcot, 2 Yes. 402.

 This proceeding is not introduced here, because of its properly forming any part of this case; but because it has been referred to as an exhibit, and because it is intimately connected with this case; and may be useful in other respects.

 1820, ch. 161, s. l.

 Hammond v. Hammond, post.

 Holme v. Stanley, 8 Ves. 1.-Lloyd v. Johnes, 9 Ves. 65. — Birch v. Glover, 4 Mad. 376.
*221 Chamberlain v. Brown. — This was a creditor’s bill, filed on the 24th of June, 1794, to have the lands of Robert Brown, a deceased debtor, sold to pay his debts, on the ground that his personal estate was. insufficient for that purpose. The heirs, who were all infants, answered by their guardian ad litem., that their said father was indebted to a much greater amount than the value of his personal estate, and which debts could only be satisfied by the aid of the real estate, which they had no objection to being applied under the authoriiy of this court, to whose care and protection, as infants, they begged leave to submit themselves. William Richmond, the administrator, by his answer, admitted that Robert Brown, late of Queen Anne county, died largely indebted to the complainants, on judgments obtained in the lifetime of the said Robert Brown, as in their said bill was alleged, &c.; and that this defendant has not assets sufficient to pay the debts of the said John Lloyd, as stated in the said bill.
20ft April, 1797. — Hanson, Chancellor. — The Chancellor has perused these papers on submission, and finds the case not ready. There is no claim established to his satisfaction; and if there were, there is no proof of the insufficiency of the personal estate.
On the 31st of July, 1797, a settlement of an account by the administrator of the deceased with the Orphans Court, shewing a deficiency of the personal estate to pay the debts was filed, and the case was again submitted.
17ft August, 1797. — Hanson, Chancellar. — This case standing ready for decision on the bill, answer, and exhibits; and the justice of the claim of one of the complainants, and the insufficiency of the personal estate of the deceased to discharge it, being fully established to the satisfaction of the Chancellor, it is Decreed, that the land be sold, &c.
A sale having been made and ratified, and a report having been made by the auditor, the case was thereupon brought before the court.
13ft June, 1803. — Hanson, Chancellor. — Ordered, that the auditor’s report be approved and ratified; that is to say, that that statement which does not allow Hanbury and Lloyd interest during the war, is approved and ratified. In no case has the Chancellor allowed interest to a British creditor during the war. In no instance, as he understands, has the General Court allowed interest during the war. The said Hanbury and Lloyd, it seems, have recovered judgments against the said Brown, to be released on payment of principal, with interest to the time of payment generally. The Chancellor conceives the fair meaning of this to be, such .interest as is legal, just, and usual. Besides, not the plaintiffs and Brown only were interested on the occasion; the other creditors were interested. In short, the Chancellor is decidedly of opinion, that interest during the war ought to be suspended. However, he is willing to receive any remarks in writing, or even hear an argument, between those concerned, at the next term.
After some time the case was again brought before the court, in relation to this matter, and the solicitors of the parties heard.
17ft August, 1803. — Hanson, Chancellor. — The complainant Jonas Chapman, as administrator of a British subject, obtained judgment in the General Court against Robert Brown, late of Queen Anne’s county, on a bond executed by the said Brown *222 to the said British subject before the war. No defence was made, but judgment was entered up in the usual way, to be released upon payment, say of £400, with interest from the date of the bond and costs. Since Brown’s death, some of his creditors have obtained a decree, in this court, for the sale of his lands for the payment of his debts. The land hath actually been sold by William Richmond, trustee. And now the said Jonas Chapman, not only claims-a preference on account of his judgment, but insists that there shall be no suspension of interest for the time during which the war between the United States and Great Britain was carried on. On the part of the other creditors it is insisted, that interest is due on the said judgment only from the date of the bond to the commencement of the war, viz. to the-r tjay of--1775 to the end of the war, viz. from the-day of September, 1783.
In various cases of claims exhibited in this court by British creditors against citizens of this state, the Chancellor has directed a suspension of-interest during the said war; and indeed the parties have never claimed it. This is the only case in which the point has been made; and as it is a question of law, which probably may come before the General Court in some other case, he takes the liberty of requesting the honourable the judges of the said court to favour him with their opinion on the subject.
On the 7th of October, 1803, the Chancellor again, by an order, asked the opinion of the judges of the General Court; but nothing further appears to have been done in the matter. By the act of 1806, ch. 55, s. 2, the Chancellor may require the opinion of the chief judge of the third judicial district on any question of law, 8cc.
Boucher v. Bradford. — This bill was filed on the I8th of February, 1789, by John T. Boucher and others against Eleanor Bradford and others, the administratrix and the infant heirs of Henry Bradford, deceased. It states, that the deceased was indebted to the plaintiffs as therein specified; that his personal estate was insufficient tq pay his debts; and that he left real estate which could not be made answerable for the satisfaction of the said claims during the minority of the said infants, but by the aid of this court, &c. Prayer that the realty might be sold, &c. The defendants answered, after which the case was brought before the court.
20th June, 1793. — Hanson, Chancellor. — Decreed, that the real estate of the said Henry Bradford, deceased, which hath descended from him, or by him been devised to the defendants, his heirs, be sold for the payment of his just debts; it appearing to the Chancellor, that his personal estate is insufficient for that purpose; and several of the claims of the plaintiffs being established to the Chancellor’s satisfaction, &c. &c., the purchaser giving bond with good security to the trustee as such, &c. &c.
Kilty v. Brown. — This was a creditor’s bill, filed on the 7th of January, 1807— William Kilty, the then Chancellor, being the only plaintiff and originally suing creditor, the bill was, according to the act of 1805, ch. 65, s. 19, addressed to the chief judge of the third judicial district. The bill stated that John Brown, deceased, was indebted to the plaintiff on several claims, one of which was ‘on a note executed by the said John Brown, with Rinaldo Johnson as his security, to Nathaniel Washington, for the sum of sixty-seven pounds, current money, bearing date the fifteenth day of December, seventeen hundred and ninety-eight; which note was assigned by the said Nathaniel Washington to this plaintiff;’ and that the personal estate of the deceased was insufficient to pay his debts — whereupon it was prayed that the real estate might be sold, &c.
*223 One of the heirs, a defendant, answered and said, that he admitted the note, but believed ‘that the said Johnson was not solely the security; but that both him and the father of this defendant were both jointly indebted in the sum for which the said note was given.’
After which the plaintiff by his petition, without oath, prayed that he might be permitted to proceed against the defendant who had appeared as the heir at common law of the deceased, and by an order of publication against his other heirs, under the act of 1797, ch. 114.
15th June, 1807. — J. T. Chase, Chief Judge. — The object of the bill in this case is to compel the defendants, &c. &c. It is stated by the plaintiff, being the Chancellor of the State and interested in the suit, to the chief judge of the third judicial district, that John H. Brown, one of the defendants, who is the eldest son of John Brown, deceased, therein mentioned, and would have been his sole heir if the act to direct descents had not taken place, has appeared to the said bill and his appearance having been entered on the docket — it is thereupon Ordered, that the plaintiff cause a copy of this order to be inserted at least three weeks successively in the Maryland Gazette before the twentieth day of July next, to the end that each of the heirs of the said John Brown, who are defendants, may have notice of the said bill, and of its substance and object, and maybe warned to appear in the Chancery Court on or before the thirtieth day of November next, in person or by solicitor, to shew cause, if any they have, Wherefore a decree should not pass as prayed.
On the 10th of February, 1809, the plaintiff William Kilty, the then Chancellor, in his notes addressed to the chief judge, says: ‘The papers in this case are sent to the chief judge of the third judicial district, on the supposition that they are ready for a decree. It was the practice of the late Chancellor, on bills for the sale of real estates, to decree, without having the case set down for hearing, whenever a sufficient ground appeared in the proceedings. In this suit, a petition was filed in June, 1807, under the act of 1797, ch. 114; and an order thereon, which is certified to have been duly published. The object of this bill is, that the suit may be carried on between the complainant and the defendant who appeared, and that there should be the same decree as if the heirs had appeared, and against them the bill may be either taken pro confesso, or a commission may be directed. According to the practice, as above mentioned, the office-copies of judgments have been considered sufficient, if not contested by the answer; and the whole of the claims exhibited have not been required to be proved as stated before a decree; but they have been laid before the auditor with further proof, together with any other claims. This much is intended to apply to that part of the answer which states, that E. Johnson was not amere surety, but was equally indebted with John Brown. But there is sufficient evidence of the other claim and of the personal estate being deficient.
20th February, 1809. — J. T. Chase, Chief Judge. — The bill in this case, which according to the act of 1805, ch. 65, s. 19, was addressed to the chief judge of the third judicial district, being ready for decision, and the claims of the suing creditor, and the insufficiency of the personal estate being sufficiently established; and the publication having been duly made, after the appearance of John H. Brown, who would have been the sole heir of John Brown, deceased, if the act to direct descents had not taken place, against the other heirs,—
It is thereupon Decreed, that the bill as to the said other heirs be taken pro confesso; and that the real estate of John Brown, deceased, not heretofore sold, or *224 so much thereof as may be necessary to pay such claims of the creditors of the said John Brown which still remain unpaid, he sold: that T. T. he and he is hereby appointed trustee to make the said sale, &c. &c.
Under this decree, a sale was made, reported and ratified; after which the auditor on the 13th of July, 1809, among other things reported, that accounts No. 1 and 2, exhibited by the complainant in this cause, were not proved ; and that No. 2 was a joint note of John Brown and Binaldo Johnson; and if proved without shewing, that Binaldo Johnson was surety only, the claimant would not be entitled to more than a moiety of the debt.
After which, on the 24th of July, 1810, Nathaniel Washington, the assignor, made oath, that the consideration of the note was for articles purchased by.Brown, — that no part of the money was due from Johnson; but that he was considered as the surety of Brown; — upon which, on the 22d of December, 1814, the whole amount was ordered to be paid out of the proceeds of the sale of the deceased’s estate.

 Ex parte, Dikes, 8 Ves. 79; Shelford on Lunacy, 357.

 Philips, Ex parte, 19 Ves. 123; 1800, ch. 67; 1828, ch. 26.

 1785, ch. 72, s. 5; 1829, ch. 222 ; 1833, ch. 150; In the matter of Brand, 6 Cond. Chan. Rep. 542.

 1721, ch. 14, s. 2; 1729, ch. 24, s. 16; Taylor v. Philips, 2 Ves. 23; Plasket v. Beeby, 4 East. 485.

 1785, ch. 72, s. 5.

 Leving v. Caverly, Prec. Chan. 229; Wilson v. Grace, 14 Ves. 172.

 Hammond v. Hammond, post.

 3 W. and M. c. 14.

 Hughes v. Doulben, 2 Bro. C. C. 614.; S. C. 2 Cox, 170; Bootle v. Blundell, 19 Ves. 328 ; Ashby v. Palmer, 1 Meriv. 296; Pow. Mort. by Coven, 69, 325.

 Hallam Mid. Ages, vol. 2, c. 8, pt. 3, page 134.

 Spelman v. Woodbine, 1 Cox, 49; Wheeler Exporte, 3 Ves. and Bea. 21; Holmes v. Higgins, 8 Com. Law Rep. 27; Dwarris on Statutes, 628.
The evils of this private legislation, it is said, in an able English Review, consists in the impossibility of giving proper attention to more business of the sort, which is already too abundant, and distracts the attention of legislators from the larger and more universal matters of state to the smaller and particular affairs of districts; a vice, in a national assembly, of which few can conceive the magnitude, who are not aware of the universal force of gravitation towards self, and one’s own kin and fellows, which, in the most intelligent, will often sacrifice to a class the good of the community. What would not be given to bribery in other forms, is given in this The bad legislator wins the hearts of his constituents, by attending to their private and local affairs; at least this is always found, in commercial communities, to be an effectual compensation for the want of statesmanship. The justice and propriety of throwing the expense upon individuals desirous of obtaining particular advantages by means of acts of parliament, can only be judged of, by ascertaining whether a distinction is always made between a personal and a general object. But it is more than to be suspected, that the reference to the legislature at all, on many matters, results from the deficiency of other institutions; and therefore, whether the objects be individual or national, there is a wrong done by continuing the system. The probability is, that in one shape or other, in the greater cost of the object, or in the lack of its more expensive use, the nation pays first or last. An instance is mentioned of a case where a bill was withdrawn, on account of the cost arising from these fees; and the writer knows another instance, where the public bodies and inhabitants of a town were deterred by the same reason.. From all of which it is to be inferred, that there are other instances of the same kind. In all of which the legislature commits a wrong. — Westminster Review, January, 1834, No. 39, page 33.

 Exporte, King 2, Bro. C. C. 158; Ex parte, Bolton School, 2 Bro. C. C. 662, 2 Mad. Chan. 719.

 The case of the Chancellor of Oxford, 10 Co. 57; Hesketh *228 v. Lee, 2 Saund. 96, a.; Boulton v. Bull, 2 H. Blac. 499; Perchard v. Heywood, 8 T. R. 472; Wallwyn v. Lee, 9 Ves. 25; Bullock v. Fladgate, 1 Ves. & Bec. 471; Vauxhall Bridge Company v. Earl Spencer, 2 Mad. Rep. 355; S. C. 4 Cond. Chan. Rep. 28; Edwards v. The Grand Junction Railway Company, 10 Cond. Chan. Rep. 85; Moore v. Usher, 10 Cond. Chan. Rep. 107; 2 Blac. Com. 344 ; 5 Cruise Dig. tit. 33.

 Pomfret v. Windsor, 2 Ves. 480.

 Sir Erancis Barrington’s case, 8 Co. 271; Provost of Eton v. Bishop of Winton, 3 Wils. 496 ; Townley v. Gibson, 2 T. R. 705; Riddell v. White, Anstr. 281; Dwarris’ Statutes, 635; 5 Cruise Dig. tit. 33.

 Westby v. Kiernan, Amb. 697.

 Ward v. Cecil, 2 Vern, 711.

 Karnes’ Pri. Eg. b. 1, p. 1, s. 4.

 Cary v. Bertie, 2 Vern. 337; Wright v. Simpson, 6 Ves. 731; Kendall, Ex parte, 17 Ves. 525; Sumner v. Powell, 2 Meriv. 30.

 Penn v. Baltimore, 1 Ves. 454; 5 Crftise Dig. tit. 33, 5, 50. — Francis Fane, counsel to-the hoard of trade, in his opinion given to that board, on the 3d of March,-1725, respecting an act passed by the General Assembly of Jamaica' to foreclose a mortgage, says: T think, in general, that such laws would be greatly dangerous, and that the legislature should rarely interfere in matters of private right, without the greatest necessity; but, I cannot see any great inconvenience in this case, but rather' a- necessity indeed, for passing the law,’ &c. After which he proceeds further to say, that ‘Mr. West, in his report upon this matter, is of opinion, that all facts alleged in the colony bills must be taken to be true. This rule may, generally, be true; but I think, in adversary bills of this nature, which are only the party’s own state of the' Case, this rule should not be extended further than the particular facts mentioned; but, I apprehend, it ought not to b'e presumed, that every thing is fully stated, and' that all facts and circumstances are disclosed, that are necessary to give a perfect insight into the merits of the bill; for though the facts alleged may be true, yet other' facts may be sunk, which may alter'the case, and defeat the allegations of the bill; neither do I think it safe to argue from the analogy and reason of penal laws in the plantations, to a bill of this kind; because rules of state policy are no proper measure to adjust private property.’ 2 Chalmer’s Opin. Em. Lawyers, 8, 10, 41; Partridge v. Dorsey, 3 H. & J. 307, note; Owings v. Speed, 5 What. 420.

 5 Cruise Dig. tit. 33, s. 51, 53 ; 2 Blac. Com. 346.

 Co. Lift. 19,

 Rex v. Sutton, 4 Ma. & Sel. 532.

 The Earl of Leicester v. Heydon, 1 Plow. 398.

 Bull, N. P. 112; Co. Litt. 360.

 4 List. 37; Com. Dig. tit. Parliament, H. 6.

J) Earl of Chesterfield v. Janssen, 2 Ves. 156.

 Bac. Abr. tit. Prerogative, 487; Hallam’s Mid. Ages, ch. 8, pt. 3, p. 183.

 The Lord Cromwell’s case, 4 Co. 12.

 The United States v. Cantril, 4 Cran. 167.

 The Lord Cromwell’s case, 4 Co. 13; Dr. Bonham’s case, 8 Co. 236; Dr. Foster’s case, 11 Co. 63; Day v. Savage, Hob. 87; The City of London v. Wood, 12 Mad. 687; Weale v. West Middlesex Water Comp. 1 Jac and Wel. 371; Dwarris’ Statutes, 643; Montesq. Spirit Laws, b. 26, ch. 3.

 1-Blac. Com. 244.

 Decla. Rights Maryland, art. 1 and 4.

 Vanhorne’s Lessee v. Dorrance, 2 Dall. 311; Calder v. Bull, 3 Dall. 386 ; Dash v. Van Kleeck, 7 John. Rep. 477; Enslin v. Bowman, 6 Binney, 471; Trustees of the University v. Foy, 2 Haywood, 310, 374; Satterlee v. Matthewson, 2 Peters, 380 ; Wilkinson v. Leland, 2 Peters, 628; Crane v. Meginnis, 1 G. and J. 463.

 Decla. Rights Maryland, art. 6.

 Const. U. S. art. 1, s. 10.

 Decla. Rights Maryland, art. 21.

 Berrett v. Oliver, 7 G. and J. 206.

 Dash v. Van Kleeck, 7 John. Rep. 508; Evans v. Eaton, 3 Wheat. 513; Crane v. Meginnis, 1 G. and J. 476.

 Karnes’ Pri. Eq. b. 2, c. 3 ; Decla. Rights Maryland, art. 39.

 McMechen v. The Mayor of Baltimore, 2 H. and J. 41.

 Beall v. Harwood, 2 H. & J. 171; Owings v. Speed, 5 Wheat. 420; Cassell v. Carroll, 11 Wheat. 149.

 The State v. Reed, 4 H. & McH. 10; Fisher v. Lane, 3 Wilson, 302; 1826, ch. 164.

 1802, ch. 84.

 1809, ch. 192.

 1650, ch. 18 and 19 ; 1668, ch. 35; 1666, ch. 7 and 8; 1669, ch. 4.

 Votes and Proc. Ho. Del. 7 and 16 January, 1803; and 5 and 7 January, 1804.

 1704, ch. 74. It appears from the report of a committee appointed at November session, 1789, to tax the costs and expenses which had accrued on the petition of Benjamin Mackall, and others against the petition, exhibited on behalf of the Reverend Erancis Lauder, that those costs and expenses were made up of the per diems, itinerant charges, and ferriages of the parties and witnesses; and amounted to £ 197 0s. 0d. current money of that time, as it is presumed. The report of the committee was not agreed to. Votes and Proc. Ho. Del. 29 December, 1779.

 1794, ch. 45: Beall v. Harwood, 2 H. & J. 168; Partridge v. Dorsey, 3 H. & J. 307, note, and 322.

 The King v. Toms. 1 Doug. 406; Perchard v. Heywood, 8 T. R. 472.

 1807, ch. 76 and 119.

 Kame’s Pri. Equi. b. 1, pt. 1, s. 4; 2 Sugd. Pow. 97; 1800, ch. 54; 1801, ch. 53 and 96 ; 1802, ch. 37; 1805, ch. 68; 1807, ch. 5.

 Blois v. Hereford, 2 Vern. 501; Attorney-General v. Day, 1 Ves. 224; Taylor v. Philips, 2 Ves. 23; Hearle v. Greenbank, 3 Atk. 712 ; 1800, ch. 54; 1803, ch. 72 and 90 ; 1819, ch. 38.

 Harvey v. Ashley, 3 Atk. 613 ; 1802, ch. 8; 1813, ch. 134 and 153; 1818, ch. 58; 1822, ch. 111.

 Shelf. Lun. 372; 1784, ch. 1; 1805, ch. 56; 1809, ch. 41; 1821, ch. 210.

 1800, ch. 68; 1807, ch. 10, 11 and 86.

 1802, ch. 40.

 Hearle v. Greenbank, 1 Ves. 305; 1826, ch. 163; 1827, ch. 73.

 Ridout v. Plymouth, 2 Atk. 105; Buchanan v. Hamilton, 5 Ves, 722; Wallwyn v. Lee, 9 Ves. 24; Com. Dig. tit. Parliament, H. 5; 1804, ch. 11; 1813, ch. 134; 1815, ch. 151.

 Sabell’s Case, Dyer, 179; Bury’s-Case, 5 Co. 99;

 1 Blac. Com. 439.

 Bac. Abr. tit. Marriage and Divorce, E. 3; Ryan v. Ryan, 1 Ecclesi. Rep. 274; February 1777, ch. 12, s. 15.

 Dartmouth College v. Woodward, 4 Wheat. 629, 693.

 1790, ch. 25; 1807, ch. 20, 30, and 103; 1818, ch. 56.

 1821, ch. 80.

 Com. Dig. tit. Parliament, H. 3; Eyre v. The Countess of Shaftsbury, 2 P. Will. 112; 1822, ch. 100.

 1 Blac. Com. 457.

 4 Inst. 36; Dash v. Van Kleeck, 7 John. Rep. 504.

 4 Inst. 36; Domat Civil Law, part 2, b. 1, tit. 1, s. 2, art. 31; 1784, ch. 6; May, 1788; ch. 8; November, 1788, ch. 21; 1807, eh. 73; 1808, ch. 13; 1814, ch, 120.

 1807, ch. 5.

 Vanhorne’s Lessee v. Dorrance, 2 Dall. 304; Calder v. Bull, 3 Dall. 386; Dartmouth College v. Woodward, 4 Wheat. 518; Owings v. Speed, 5 Wheat. 420; McCreery v. Somerville, 9 Wheat. 354; Satterlee v. Matthewson, 2 Peters, 380; Wilkinson v. Leland, 2 Peters, 627; Dash v. Van Kleeck, 7 John. Rep. 477; Enslin v. Bowman, 6 Binn. 462 : Trustees of the University v. Foy, 2 Haywood, 310, 374; Jones v. Crittenden, 2 North; Carol. Law Repository, 385; Berry v. Haines, 2 Ib. 428; Allen v. Peden, 2 Ib. 638; Opinion of the Judges of Georgia, 2 Ib. 31; Per Judge Martin of Louisiana, 2 Ib. 173 ; Crane v. Meginnis, 1 G. and J. 463 ; Berrett v. Oliver, 7 G. and J. 192; Acts of Assembly of Maryland of 1781, ch. 3 ; 1785, ch. 9; 1795, ch. 30 ; 1807, ch. 24, 52, 121, 138, and 149; 1808, ch. 17, 73, and 101; 1809, ch. 164; 1811, ch. 101; 1814, ch. 14; 1815, ch. 71; 1816, ch. 164; 1817, ch. 204; 1818, ch. 90; 1819, ch. 53; 1820, ch. 147, and 172; 1825, ch. 88; 1826, ch. 7, and 164; 1827, ch. 67, and 141.

 1825, ch. 135, ante 215, note.

 Andrew v. Wrigley, 4 Bro. C. C. 138. — By the act of 1831, ch. 311, s. 12, if constitutional, this court has been clothed with power to mortgage the interest of infants in lands, where it shall appear to be for their advantage so to procure money, for the benefit of such estate of the infants ; or to improve the same, orto relieve it from any incumbrance, or otherwise, for the benefit of such infants. — Williams’ Case, post. 3 Vol.

 5 Geo. 2, c. 7.

 Bac. Abr. tit. Heir and Ancestor E.

 Coleman v. Winch, 1 P. Will. 777. Mathews v. Jones, 2 Anstr. 506.
Craig v. Baker. — This bill was filed by Robert Craig, on the 17th of September, 1770, against the administrator, heirs, and devisees of Henry Baker, deceased. It stated that the plaintiff and the late Henry Baker were the owners of a brig, and as partners had her sent on several voyages ; that the plaintiff purchased Baker’s half of the vessel for £650 Os. Od.; and it was then agreed between them, that all their accounts should be fully and finally adjusted; but before they came to any settlement Baker died, having first made his will, by which he disposed of all his estate, real and personal, among his children; that his son Erancis, who became his administrator, alleges that his personal estate is not sufficient to pay his debts; that the administrator has brought suit at law against this plaintiff for the recovery of £ 650 Os. Od., the price of his intestate’s half of the brig; and also, to recover the amount of certain protested bills of exchange, drawn on account of the partnership concern; that on a fair adjustment of accounts it will appear, that the late Henry Baker was greatly indebted to the plaintiff. Prayer for an account; for an injunction to stay the proceedings at law; and for general relief. An injunction was granted as prayed, and the defendants answered.
A commission was issued on the 18th of July, 1774, in the usual form, to audit and state an account. Under which the commissioners, on the 7th of May, 1785, returned an account, by which it appeared, that there was a balance due to the plaintiff of £863 3s. 3d. with interest thereon from the 22d of April, 1767, to the 22d of April, 1785.
The plaintiff, with leave, filed an amended bill, in February, 1786, the making other *239 devisees and their heirs parties, specifying the real estate which came to their hands; and then alleging, ‘that all the parties aforesaid claiming under the will of Henry Baker aforesaid first named, have had notice of your orator’s claim; but none of them have ever paid or offered to pay any part thereof; and also, that the estates held by the other defendants, Jeremiah Baker, of Cecil county, Henry Baker, son of Francis, of Harford county, and Nathan Baker, of Cecil county, which they derived from Henry Baker first mentioned, together with the personal estate of the said Henry, and the estate devised to Francis, h¡3 son aforesaid, are greatly more than sufficient to pay your orator’s claim.’
The defendant Jeremiah Baker, by his answer, without admitting the plaintiff’s claim, stated among other things, that the tract called Clayfall, devised to him, was without improvements, and had been mortgaged, and came to him so mortgaged, which mortgage he had satisfied; that there was no improvements on the said land at the time of the death of the said Henry; but that this defendant hath since made valuable improvements, and erected buildings thereon; that the personal estate of the said Henry was not sufficient, as he understood and believed, to pay the claims against him; that he had no knowledge, that any balance was due to the plaintiff, but had always understood and supposed the contrary; and that in any event he could only be answerable for the reasonable value of the said lands to him devised, as they were without improvements, at the time of the death of the said Henry, after deducting the amount of the mortgage money paid by him, this defendant
The administrator Francis, by his answer, admitted, that he was a devisee, and as such held a portion of the real estate of his father; and said that he had no assets in his possession, and had fully administered the same, and had paid away of his own money, in discharge of the debts of the said Henry above and beyond the personal property of the said Henry, which had come to his possession as administrator, upwards of seventy pounds current money, computing dollars at six shillings, as would appear by his account passed in the commissary’s office, which he annexed arid prayed to be received as a part of his answer, which amount he was in equity entitled to retain against any creditors of the said Henry out of the value of the said property devised to him.
The infant defendant Nathan Baker, answering by his guardian ad. litem, admitted, that .he held possession as heir of his father Jethro, the tract called Yanbibber’s Forest, which was devised to him by the late Henry. And he also averred, that the administrator had in his hands, unaccounted for, assets sufficient to pay all the debts of the deceased.
Upon which commissions were issued and testimony taken and returned, and the case was thereupon brought before the court.
6th January, 1790. — Hanson, Chancellor. — This case standing ready for hearing, and coming on to be heard and debated by counsel as well on the part of the complainant as on the part of the defendants, and the bill, answers and several exhibits aforesaid having been read, and appearing as herein before set forth.
Whereupon it is Decreed, that Robert Craig, the complainant, is entitled to recover and receive from the real estate of Henry Baker, senior, deceased, the sum of £868 3s. 3d. current money, with interest thereon from the 7th day of May, 1785, that being the day on which the debt due from the said Henry Baker, senior, was liquidated and ascertained by the auditors chosen by the parties; and that the complainant is further entitled to receive from the said real estate his legal costs by him expended in the prosecution of this suit.
And it is further Decreed, that the defendant Francis Baker, devisee of the said *240 Henry Baker, senior, hath in his hands the sum of £100 current money, that being the consideration which he received for a house and Jot in Charles Town, Cecil county, sold by him, and which house and lot had been devised to the said Francis Baker, by the said Henry Baker, senior, and was liable to the payment and satisfaction of the debt and interest thereon due to the complainant.
And it is further Decreed, that the same sum of £100, and interest thereon, from the 7th day of May, 1785, is and shall be assets in the hands of the said Francis Baker, devisee aforesaid, who is hereby ordered to pay the same to the complainant towards satisfaction of his debt, interest thereon and costs aforesaid.
And it is further Decreed., that the defendant Nathan Baker, devisee of Jethro Baker, who was devisee of Henry Baker, junior, who was devisee of Henry Baker, senior, hath in his hands the tract of land, called Vanbibber’s Forest, liable to the payment and satisfaction of the sum of money aforesaid, and interest thereon, and costs hereby decreed to the complainant. And it is Ordered, that the said tract of land, called Vanbibber’s Forest, is and shall be assets in the hands of the said Nathan Baker, devisee aforesaid, to satisfy the complainant the debt, interest and costs aforesaid.
And it is further Decreed, that the defendant Jeremiah Baker, hath in his hands a tract of land, called Clayfall, devised to him by the said Henry Baker, senior, deceased; that the said tract of land, being at the time of the decease of the said Henry Baker, senior, of the value of £900 current money, and at the same time under mortgage for a debt of £300 sterling, equal to £500 current money, and the same devisee having since redeemed the said mortgage, he, the said Jeremiah Baker, is answerable to the complainant for the sum of £400 current money, with interest thereon from the 7th day of May, 1785 5 it is, therefore, Ordered, that the defendant Jeremiah Baker, pay to the complainant towards the satisfaction of his debt, interests thereon apd costs aforesaid, the sum of ¿6400 current money, with interest thereon, from the 7th day of May, 17S5, aforesaid.
And the said defendant Henry Baker, brother and heir of Samuel Baker, who was devisee of Henry Baker, senior, having stood out the process of this court, it is Decreed, that the complainant may proceed to take out a commission to prove his allegations against the said defendant Henry Baker, subject to such future order and decree therein, as this court shall make respecting the same; 1785, ch, 7?, s, 19. — Chancery Proceedings, lib. S. II. If. lett. C. fol. Ill, 136,

 Ex parte, Morton, 5 Ves. 449.

 Co. Litt. 102; 1 Pow. Mortg. 547, note R.; Sugd. Vend. & Pur. 535; Calvert Parties, 101.